## HEIRS OF DUVERGE *v.* SALTER and MARCY.

Our laws secure the public use of the banks of navigable rivers, and within the incorporated limits of towns the municipal government *is* authorized to regulate that use; but their regulations must be in furtherance of the public use to which the banks are subjected, and cannot be taken advantage of for the purpose·of forever enjoying the property of the riparian proprietor, which is not necessary for public use.

*Carrollton Bank* v. *Winthrop,* 5th Ann. 36, *affirmed.*

The public have the right to use the banks of navigable rivers, but this right does not authorize the permanent location of a dry-dock in front of the land owned by another person.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge,* J. *Benjamin* and *Micou,* for plaintiffs. *J. R. Grymes* and *G. Schmidt,* for defendants. The judgment of the court was pronounced by

EUSTIS, C. J. The plaintiffs are the owners of a piece of land on the bank of the river opposite New Orleans, having some two hundred and forty feet on the public road, and extending in depth to the Mississippi. This land, with a lot adjoining it, which the plaintiffs had leased to one *Rouse,* has been used as a ship-yard for nearly thirty years, and for the most of that time has been occupied for that purpose by one or other of the defendants. It was originally leased to *Bailey* and *Marcy,* and subsequently to their successors, the present defendants, *Salter* and *Marcy.* They also partially occupied the adjoining lot, called the *Rouse* lot, under a sub-lease from *Rouse.* In addition, they occupied an adjacent lot belonging to themselves. The lease appears to have been extended under a verbal agreement until the year 1849, when *Rouse,* having notified the plaintiffs that he intended to give up his lease, the plaintiffs notified the defendants of the fact, and offered a lease of both lots to the defendants for the term of three years, at the rate of $2700 per annum, payable monthly. The defendants declined accepting the proposal, considering the rent too high, and notified the plaintiffs that they had made up their minds to give up the leased premises, which they hoped to be able to do by the 1st of July ensuing. Their letter bears date, March 28th, 1849, and states, that with regard to *Rouse's* lot they had nothing to say; that plaintiffs might rent it to whom they pleased. This letter was answered on the 3d of April, as follows, by the agents of the plaintiffs : "Your letter of the 28th of March has been received; and not being able to come to an arrangement with you, I have changed my mind on the subject, and hereby notify you to return the premises which you now occupy, to wit, the ship-yard leased by you from me, at the expiration of your month's rent, to wit, on the 1st of May, 1849; my intention being to build on said property, and to contract for said buildings to be commenced on the 2d of May next, considerable damage might result from any delay on your part to comply with the present notice."

On the 17th of May following, the plaintiffs instituted proceedings against the defendants for the purpose of having them ejected from the premises leased, and recovering possession thereof. Judgment was rendered in favor of the plaintiffs on the 7th of June next ensuing. On an appeal, we were under the necessity of reversing that judgment, and dismissing the petition of the plaintiffs, on the ground of the unconstitutionality of the act of the Legislature under which the proceedings were conducted. *Heirs of Duvergé* v. *Salter* and *Marcy,* 5th Ann. 94. This was at the January term of 1850; and on the 1st of February,

1850, the present suit was instituted. The petition, after stating the facts of the lease, &c., and the refusal of the defendants to deliver up the property to the plaintiffs, asks for judgment against them, by reason of their tortious acts in withholding the same and depriving the plaintiffs of the use thereof, for the sum of $10,000 damages, and also rent at the rate of $2700 per annum, being the price at which the defendants were notified the plaintiffs would only consent to a renewal of the lease of the lots from the 1st of May, 1849. The defendants pleaded the general issue; and the case was, at their instance, tried by a jury. The verdict was in favor of the plaintiffs: 1st, for rent from the 1st of May, 1849, to 1st of May, 1850, $2700; 2d, $500 damages; and 3d, in the event of the defendants continuing in retaining possession after the 1st of May, 1850, they were to pay the plaintiffs rent at the rate of $3000 per annum. The judgment of the court was in accordance with the verdict, and the defendants have appealed.

The principal difficulty between the parties is stated, on behalf of the defence, to be a floating dry-dock, belonging to the defendants, which is fastened in front of the plaintiffs' land. It is also contended, that the amount of the verdict is excessive, and unsupported by law or evidence; and that the only damages which can be recovered must be proportionate to the loss sustained. The defendants, in support of their pretensions to lay their dock in front of the plaintiffs' property, and to fasten it to the shore, refer to the articles of the code on the subject of navigable rivers, which are classed among public things.

The use of the banks of navigable rivers is public. Every one has a right to bring his vessels to land there; to make fast the same to the trees which are there planted; to unload his vessels; to deposit his goods; to dry his nets, and the like. Nevertheless, the property of the river banks belongs to those who possess the adjacent lands. Art. 446. On the borders of the Mississippi, where there are levees, the levees shall form the banks. Art. 448.

It appears that the defendants' dry-dock is moored in front of the property leased by them—that is, the principal part of it is so moored; the rest being in front of the other lot. The dock is some two hundred and thirty feet long, and the width proportionate; it is secured by chains at both ends to the shore, and there is a staging from the shore to the dock. When the witness *Gardere* testified, he had been on the premises two days before, and there found fire-wood for the use of the dock, and men at work in connection with the work doing on a vessel which was in the dock; there were boys at work boiling pitch and tar, and materials for ship building: and no change had been made in the location of the dock for ten months previous. It is admitted by the plaintiffs, that the defendants offered the plaintiffs, on the 31st of May, 1849, the possession of the premises leased by them. The plaintiffs refused to receive it, on the ground that the dry-dock of the defendants, which was floating in front of the leased premises, moored to the shore, and connected with it by permanent staging, was not removed; and that defendants had openly avowed their intention never to remove it; and the plaintiffs, that they still persist in their refusal to accept the delivery of the leased premises, until the removal of the dock. The dock is moored about sixty feet from the shore; the staging is like that used for ships on this side of the river, except that it is stronger, on account of the distance of the dock from the shore.

The premises occupied by the defendants we have seen were ship-yards, used for years for that object alone. It is the river front, and their proximity to New Orleans which gives them their value. These establishments, which are matters of necessity in a port like this, have been considered proper subjects of

special legislation. By an act of the Legislature, of the 28th of March, 1840, which established a police jury for that portion of the parish opposite the city, in conferring the ordinary police powers on that body relating to the banks of the river, an express reservation is made in relation to the ship-yards. It enacts, that the police jury shall be invested with full power to order and make such regulations and rules as they may deem proper for the making and repairing of the levees, dykes, &c.; for the pulling down and removal of all buildings and incumbrances that may obstruct the levee or the space between the levee and the river, except the ship-yards that are now existing.

This is nothing else than a formal acknowledgment of these necessary establishments, and of, at least, a forbearance of the exercise of the public use in respect to them, by the withholding of any authority to interfere with them from the ordinary municipal power.

On the first application of the plaintiffs for the delivery of the premises, *Marcy*, one of the defendants, originally averred, that they had as much right there as any one else—meaning the place occupied by the dock as it then lay—and that he would not give it up. This right is asserted to the last, and is the point on which the case turns.

So far as the right of the plaintiffs to hold and use the property as a ship-yard is concerned, the objection comes with a very ill grace from those who have occupied it under a lease from the plaintiffs for that purpose; and if the right of property and the sanction of law can constitute ownership, the plaintiffs certainly have it. To offer to return the land, and at the same time render the front inaccessible for its ordinary uses, by the location of this floating mass, appears to us to be mere mockery. The pretensions of the plaintiffs to keep their dock permanently in front of the plaintiff's property are equally in violation of the public right, under which they are asserted, as to the owner to whom they have paid rent. Every payment they have made during the years of their tenancy has been a virtual recognition of the plaintiffs rights, and a denial of the pretensions now for the first time set up. It would be an unnecessary work to show how totally unfounded the defendant's claims are, under the general law concerning the navigation of rivers and the uses of their banks. The subject has been examined, and the authorities referred to, in the recent case of the *Carrollton Railroad* v. *Winthrop*, 5th Ann. 36.

Under these conclusions, it only remains to examine the subject of damages and rent allowed by the judgment appealed from.

The 1st of May was the day after the termination of the lease of the defendants, and was the day on which the plaintiffs demanded the possession of their property, in 1849, by giving the notice to quit the premises at a seasonable time previous. This fact the defendants well knew, and regulated their work accordingly. We can make no discrimination in relation to the rent of the two lots, because the dock lay in front of both, that is, on the dividing line ; and because the right of the defendant is formally asserted as to both. The price asked by the plaintiffs for the hire of the ship-yards for a three years' lease, was $1200 for *Rouse's*, and $1500 a year for that occupied by them. It is proved, we think, satisfactorily, that this rent was not exorbitant. The plaintiffs fixed that price, as they had a right to do; and it rested with the defendants to continue to retain the property, or to give it up. The rents of this description of property are high; and more than this sum, it is proved, has been offered for lots in the vicinity not so well situated as these. The facts of this case differ materially from those in the case of *Rodriguez* v. *Combes*, 6 M. R. 275, cited by counsel.

In this case, the tenant refuses to attorn, so far as the most valuable right of the estate is concerned; he, without any cause, disputes the title to this right in his own landlord, and succeeds in frustrating all his attempts to obtain possession of his property, and exposes him to the trouble and expense of a vexatious litigation. Considering all the circumstances, we do not think, in condemning the defendants to pay the further sum of five hundred dollars, the jury and the court below exceeded the limits of a sound discretion. The plaintiffs wanted their lots for the purpose of building warehouses and constructing wharves. For the latter they actually contracted; and there is no reason for questioning the sincerity of their project of improving the property. The defendants received written notice of their intention; and had they manifested any other purpose than that of resistance, we think the admission on record shows that they would have been met with a just spirit of accommodation as to the time of the removal of the defendants' new dock, then on the ways, and their materials from the premises. The only ground of refusal to receive possession, in May, 1849, on the part of the plaintiffs, was the non-removal of the dock from the front. The addition of the sum of $300 per annum to the rent of $2700, should the defendants still persist in their wrongful acts after the expiration of the year, we think no more than a just measure of precaution in vindicating the plaintiffs' right of property and insuring it from future violation.

The judgment of the district court is therefore affirmed, with costs.