(72 South. 984)

No. 21880.

STATE v. RICHARDSON et al.

(Oct. 6, 1916. On Application for Rehearing, Nov. 24, 1916.)

*(Syllabus by the Court.)*

1. NAVIGABLE WATERS &#9740;36(1)—LANDS UNDER WATER—OWNERSHIP BY STATE—"ALLUVION"—"BANK."

The state, in virtue of its sovereignty, became the owner of all lands underlying the navigable waters within her territory, below mean high water, with power to determine the rights of riparian proprietors with respect thereto, subject only to the limitations imposed by and under the Constitution of the United States; and, in the exercise of that power, she has enacted laws which have been read into the titles of all lands bordering upon such waters, and which declare, in effect, that the property of the beds of navigable streams is in the public, so long as they are covered with water; that the "banks" are that which contains the river, in its ordinary state of high water; that the ownership of the banks is in those who possess the adjacent lands; that the accretions which are formed, successively and imperceptibly, to any soil situated on the shore of any river or stream, are called "alluvion," and belong to the owner of such soil, who is bound to leave public that portion of the bank required by law.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–182, 184, 200; Dec. Dig. &#9740;36(1).

For other definitions, see Words and Phrases, First and Second Series, Bank.]

2. NAVIGABLE WATERS &#9740;44(3) — RIPARIAN RIGHTS—ALLUVION.

Construing those various provisions together, and with reference to the doctrine that all lands between the banks of a river, below mean high-water mark, constitute its bed, it is evident that the law and the doctrine cannot stand together, and equally evident that the lawmaker never intended that they should, but that, in the enactment of the law, the state established an exception to the doctrine, whereby the alluvion, formed as described, upon soil lying upon the edge of the waters of a navigable stream, becomes susceptible of private ownership and the property of the owner of such soil, subject to the servitude of use in favor of the public, from the time of its emergence, with a reasonable appearance of permanence and identification with the soil of the shore, above the surface of the water, at its ordinary stage.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 270, 277, 281; Dec. Dig. &#9740;44(3).]

Appeal from First Judicial District Court, Parish of Caddo; T. F. Bell, Judge.

Action by the State against J. S. Richardson and others. From a judgment for defendants, the State appeals. Affirmed.

The following is the sketch referred to in the opinion:

R. G. Pleasant, Atty. Gen., and Harry Gamble, Asst. Atty. Gen. (Leland H. Moss, of Lake Charles, and G. A. Gondran, of New Orleans, of counsel), for the State. A. V. Coco, Atty. Gen., for the State on application for rehearing. Thigpen & Herold, of Shreveport, for appellees.

Statement of the Case.

MONROE, C. J. The case here presented for decision is stated by the counsel, respectively, as follows:

"This suit was brought by the state of Louisiana against J. S. Richardson and Benedum & Trees in the form of a petitory action, the state alleging that it is the true and lawful owner of all the property within the banks of Red river, below ordinary high-water mark, in section 24, township 13 north, range 11 west. * * *

"It is alleged that Benedum & Trees, as lessees of Richardson, have been drilling wells below ordinary high-water mark in said section, * * * and have been extracting therefrom large quantities of oil which belonged, and belongs, to the state of Louisiana. The suit was brought for the purpose of determining the limits of the state's ownership in the bed of Red river at the point indicated, and to recover, from those who had extracted it, the oil produced from the state's property.

"Defendants answered, admitting the title of the state to the bed of Red river; denying that they had trespassed on any portion of the state's property; denying that they had ever claimed any part of the river bed; and praying that the boundary of their property and that of the state might be judicially determined."

It was made of record in the course of the trial that:

"The state does not contest the ownership of J. S. Richardson in section 24, in so far as such property is susceptible of private ownership."

It appears that the state, through the Attorney General, requested the state board of engineers—

"to establish what, in the opinion of the * * * board, * * * constituted a full bank, full stage; in other words, to establish what, in the opinion of the state board of engineers, would be synonymous with the expression 'the ordinary stage of high water.' "

And that, in complying with that request, the state board, through the chief state engineer, adopted the view and gave the directions as follows (quoting the language of the chief state engineer), to wit:

"We recognized that it was somewhat of a difficult question, and it would have to be reduced to units of length, as far as the banks of the river were concerned; that not every foot of the bank of the river could be taken into consideration, but the length should be reduced to a convenient unit; and they adopted one mile, constituted for examination and consideration, and my instructions to Mr. Bell [the engineer who was employed by the Board to superintend the work] were to run levels and determine that elevation in that unit where the river ceased to contain itself. Whatever that elevation was where the river ceased to contain itself and overflow the contiguous country, that condition

was controlled within that unit, then the next was taken, and the mile was then determined and applied, and so on down the river. The unit system was established as a matter of convenience. It was impossible to determine every foot of the length of Red river, and, the slope of the river being so gradual, the difference within that mile could easily be checked off with the difference in the elevation within that limit or unit."

Mr. Bell's statement of the manner in which he executed the instructions so given to him is as follows:

"Well, levels were first run along this bank— the original bank of the river— and then they were plotted, and the lowest elevation was taken as the unit to determine at what elevation the water will flow over the bank within that limit and overflow the land near it. We used this to establish the bank full stage."

The view of the state, then, is that the "bank full stage" (meaning the stage at which the river ceases to contain itself within its banks) and the "ordinary stage of high water" are equivalents, and that all land lying below that level constitutes the bed of the river and is the property of the state.

Defendants contend that the land in dispute, being alluvion, formed upon land of which the defendant Richardson is unquestionably the owner, has become susceptible of private ownership, and is therefore owned by him, even were it below the level of the ordinary stage of high water (which they deny is the case); that the "bank full" stage is an extreme, and not an "ordinary," stage of high water, and hence that the theory upon which the state and the engineers have proceeded is erroneous; and that the board, in attempting to determine the level at which the river ceases to contain itself, has theoretically established a higher level than is warranted by the facts. The learned counsel have also, this to say in their brief, to wit:

"Under the petition and under the stipulation" —the word "stipulation" being applied to the admission that "the state does not contest the ownership of J. S. Richardson in section 24, in so far as such property is susceptible of private ownership"—the state is definitely cut off from any claim or assertion of title to any *land* or to

the banks of the river (declared by article 455, C. C., to be in private ownership), or to anything lying above the ordinary stage of high water, and the sole issue, as held by the district judge, is the delimitation of that which is owned by the state as a sovereign—namely, the *bed* of Red river."

In order to facilitate the expression of our views upon the questions at issue, and the better to enable the parties in interest to understand those which relate to the facts, the subjoined rough sketch has been prepared (see page 984), and, though no attempt at accuracy has been made in its preparation, it may serve the purpose indicated, with the following explanation, to wit:

The area designated "Peninsula," down to the line "P1," represents the natural, left, descending, bank of the river, is high and dry land, covered with hardwood trees, such as oak, pecan, and hackberry, has long been in cultivation, and is not here in dispute. At some time in the past, the "Peninsula," then, no doubt, merely part of a larger body of land, with a different configuration, was included in what was known as "Stallings' Bend Plantation"; but (probably at a later period) the river occupied as its bed the areas or part of the areas designated "Bay" and "Hook of the Peninsula," and still later the destroying power of the river became so directed against the land at the lower and outer side of its bend, and its constructive operations to the upper and inner side, that it began depositing its sediment against the lower end of the Peninsula and thereby added the "Hook," beginning at P1 and extending around the bend and northeastwardly until it is said to lose itself in broken sand bars about the upper line of section 19. In that process deposits were also made in the area between the Hook and the Peninsula, but in less degree than upon the Hook, and in less degree in the area lying in section 24 than in that lying in section 25. That portion of the Bay which lies in section 24 is, in general, lower than the banks indicated by the lines P and P2 (save, perhaps, part of P2, extending into section 24), and, for the accommodation of those who are engaged in drilling and operating oil wells, bridges have been constructed between the two points mentioned, which stand 10 feet or more above the mean level of the intervening surface, and the floors of the derricks used in drilling the wells are equally elevated. Beyond that, it is shown that the ground (save, perhaps, in the ridges to which we will refer) is soggy, covered with a semiaquatic growth of willows, cottonwoods, and cockle burrs, and in its present condition wholly unfit for cultivation. It is said that, years ago, a portion of it was cultivated, and that cattle were pastured there; but our understanding of the testimony upon which that statement is based (that of Messrs. Robinson and B. W. Marston, Jr.) is that it refers to land owned by defendant on the Peninsula. It is shown that the area in question is broken by ridges, the elevations of which or most of which, are below the level of the contour as established by the state engineers—the oil wells having, apparently, been drilled as a rule upon the higher ridges; and there are witnesses who testify (and we find their testimony entirely credible) that, by drainage, plowing across the ridges, and thus leveling the land, and raising and "turning in" cow peas, it could be brought to a condition about equal, for purposes of cultivation, to a considerable proportion of the cultivated land in the parish.

## Opinion.

[1] The major premise of defendants' first proposition is found in the admission that:

"The state does not contest the ownership of J. S. Richardson in the section 24, in so far as such property is susceptible of private ownership."

The minor premise is the assumed demonstration that every well on section 24 is located on land susceptible of private ownership. And the conclusion is that the owner-

ship in J. S. Richardson of the land here claimed is beyond contest.

Plaintiff's demand is not however, confined to the sites of oil wells, but relates to a body of land, said to constitute the bed of the river, of which those sites are but parts. If all the land claimed has been demonstrated to be susceptible of private ownership, defendants' conclusion is sustained, and plaintiff's demand must be rejected.

It can hardly be denied that anything which constitutes property, or an interest in property, and which possesses any value, or conceivable value, for any purpose whatever, is susceptible of private ownership, unless there be some law to the contrary. The "law to the contrary," in this instance, is said to be that which declares that the beds of navigable rivers are "public," and hence not susceptible of private ownership. The case then turns upon the question: Is the land in dispute part of the bed of Red river, within the meaning of that law—the navigability of the river being conceded?

The learned counsel for plaintiff begin their argument with the statement, that:

"It is settled as a principle of federal constitutional law that the absolute ownership of the beds of navigable waters within the states is vested in the states, respectively, * * * by force alone of their admission into the Union under the Constitution,"

In support of which they quote familiar and conclusive authority. They aver that "the boundary line of the state's property is fixed at ordinary high-water mark," and there can be no question as to the accuracy of that statement.

They make the statement contained in the following quotation from the opinion in McGilvra v. Ross, 215 U. S. 76, 30 Sup. Ct. 31, 54 L. Ed. 95, to wit:

"The title and rights of riparian, or littoral, proprietors in the soil below high-water mark * * * are governed by the laws of the several states, subject to the rights [i. e., as to navigation] granted to the United States by the Constitution."

And that statement is likewise incontestable.

We therefore start from the basis of the two propositions, the one as well settled as the other: (1) That the state of Louisiana, in virtue of her sovereignty, owned the land underlying the waters of Red river below mean high-water mark; (2) that the rights of riparian proprietors with respect thereto are governed by the laws of Louisiana.

The laws of Louisiana, so far as they may be thought to bear upon this inquiry, are contained in the Civil Code and read as follows:

"Art. 453. Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation; of this kind are * * * the beds of rivers, as long as the same are covered with water."

"Art. 455. * * * The use * * * of the banks of navigable rivers, * * * is public. * * * Nevertheless the ownership of the the river banks belongs to those who possess the adjacent lands. * * * *"

"Art. 457. * * * The banks of a river * * * are understood to be that which contains it in its ordinary state of high water; for the nature of the banks does not change, although for some cause they may be overflowed for a time.

"Nevertheless on the borders of the Mississippi and other navigable streams, where there are levees, established according to law, the levees shall form the banks."

The French version of the article last above quoted (formerly 448) contains the word "lit" (bed), in the first line, instead of "rive" or "borde," which was, no doubt, changed to "banks," in the translation, because of the difficulty of construing it with "les rives" and "les bordes," as subsequently used.

"Art. 509. * * * The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion. The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."

In Morgan v. Livingston, 6 Mart. (O. S.) 19, plaintiff, claiming under J. B. Poeyfarré, brought a petitory action for the recovery of certain property, lying on the river front and described as "batture," alleging that it had formed to his land after his purchase and that defendant had taken possession of it without title, to which defendant answered that the description, "frente al rio," in the sale to Poeyfarré, did not convey a riparious estate, because the land had been sold ad mensuram and according to a plan, because there was a royal road between the land and the batture, because the batture was in existence at the time of the sale to Poeyfarré and was not included in the description, and because there was a levee between the land and the river.

"Batture" (said Judge Martin, in the course of his opinion, p. 216), "is, according to Richelet and the French Academy, a marine term, and is used to denote a *bottom of sand, stone or rock mixed together, and rising towards the surface of the water;* its etymology is from the word '*battre,*' to beat, because it is beaten by the water. In its grammatical sense, as a technical word, and we believe, in common parlance, it is then an elevation of the bed of a river, *under the surface of the water,* since it is rising towards it. It is, however, sometimes used to denote the same *elevation of the bank, when it has arisen above the surface of the water,* or is as high as the land on the outside of the bank." (Italics by the present writer.)

Whether, at the time of the sale to Poeyfarré, there existed a batture, susceptible of private ownership, seemed to have been regarded by the court as dependent entirely upon its existence, *vel non, above the surface of the water.*

On that question, and concerning the contention that the land which had been sold was separated from the river by the levee, the court said (pages 228, 229):

"We conclude that the existence of a batture *above the surface of the water* is not proved, and rather disproved. * * * Finally, that the uncontradicted testimony of two witnesses proves that the premises in dispute *did not exist, as a batture above the water,* when Poeyfarré acquired the trapezium of land before which it stands, and therefore that no proof results (as is contended by defendants' counsel),

from the batture, of an intention of the parties to give to the land sold another boundary than the river. * * *

"The bank of a river is defined to be *that which confines the river in its utmost height;* * * * '*ripa putatur esse quæ plenissimum flumen continet.*' * * * The bank is that space which the water covers when the river is highest in any season of the year. * * * The levee, then, *as well as the batture, under the surface of the water, is a part of the bank,* and the bank is a part of the river, which consists of three things, the water, the bed, and the bank. If these two objects, the levee · and the batture, form a part of the river, they do not exist beyond the river, and, consequently, not between the river and the trapezium."

The court reached its conclusion as to the nonexistence of the batture without reference to the ordinary stage of high water, and the plain inference from the opinion and decree is that, if it had been shown that such a thing as a batture was visible above the surface of the water, at its ordinary stage, when Poeyfarré acquired the adjacent property, it would have been held that it was susceptible of private ownership and that there would have been judgment for defendant.

The definition of the word "river," as given by Judge Martin, has been elsewhere somewhat elaborated as follows:

"A river, then, consists of water, a bed and banks, these several parts constituting the river, the whole river. It is a compound idea; it cannot exist without all its parts. Evaporate the water, and you have a dry hollow. If you could sink the bed, instead of a river you would have a fathomless gulf. Remove the banks, and you have a boundless flood."

In Cochran v. Fort, 7 Mart. (N. S.) 622, 633, Porter, J., in determining that the batture there in controversy was susceptible of private ownership, said:

"Whether it was of sufficient height to be susceptible of ownership at the period of the sale from Hevia is the next question. * * * There is no positive evidence before us at what height batture may be reclaimed from the river, and appropriated to private use. It is not, perhaps, susceptible of direct proof, much depending on the position of the alluvion, the force of the stream where it is formed, and other circumstances. It is proved beyond doubt that, so far back as 1793, the batture opposite Hevia's lot was of sufficient height to enable him to erect a cabin on it; that it continued to increase

in extent and height from that time until 1803; that in the last-mentioned year it was only covered by high water to the depth of five feet. With this elevation, a levee of less size than many found on the Mississippi would have enabled the proprietor to have excluded the river, and convert the soil to such purposes as he might have thought proper, or found profitable. We have been unable to discover in all the evidence any reason for saying this batture was not susceptible of ownership, except it being covered during the annual innundation of the river by the water. But this circumstance does not authorize the court to conclude that the alluvion was not susceptible of ownership."

There is no other reference in the opinion from which the foregoing excerpt is taken to the "ordinary stage of high water" save that from which it appears that, at such stage, the land in controversy was submerged to a depth of five feet, and there is no suggestion that, on that or any account, it was to be considered part of the bed of the river.

In Cire v. Rightor, 11 La. 140, the court dealt with the question, here and there under consideration, as one of fact, saying:

"On the merits, this case is strongly analogous to that of Cochran v. Fort et al., *and turns upon a question of fact, to wit,* whether, *in 1812, a batture had been formed of sufficient height and magnitude to be susceptible of private ownership.* The jury, to whom this question was submitted, decided it in favor of defendant, and negatived the allegation in the petition that, at the time of the sale from Conway, *no batture existed* in front of the lot in question. The evidence on this point is before us, and, after a careful examination of it, we are unable to pronounce that the verdict is erroneous." (Italics by the present writer.)

In Barré v. City of New Orleans, 22 La. Ann. 612, it was said (in the original opinion):

"If, at the time of the sale of riparian land, the alluvion attached has attained a sufficient elevation above the waters to be susceptible of private ownership, the alluvion does not pass with the land, unless so expressed."

On the rehearing:

"But there is no evidence whatever to show that *any alluvial formation existed* in front of lot 34 when Marie St. Jean bought it, or when it was sold at public sale. If the batture were formed subsequently, it belonged to the person who owned the lot at that period."

In Ferriere v. City of New Orleans, 35 La. Ann. 209, it was held that a batture, susceptible of private ownership, existed at the time that plaintiff's author in title acquired the adjacent land, and, not being specially mentioned, did not pass with the land, but the opinion is silent as to those qualities which made it susceptible of private ownership and distinguished it from a batture of which no such ownership could be predicated.

In Succession of Delachaise v. Maginnis, 44 La. Ann. 1047, 11 South. 716, the court said:

"It is apparent that there are two pivotal questions, viz.:
"1. The question of fact, whether or not, at date of sale, in 1855, there did exist in front of Water street any alluvion then susceptible of private ownership. * * *"

After some discussion of the burden of proof on the question stated, the opinion proceeds:

"The defendant here has introduced two witnesses, who prove that in 1855, and even as late as 1889, the levee was immediately in front of Water street, and even partially encroached on the street, and that, but for the protection of the levee, Water street itself would have been under water. It is further proved that when, in 1889, the present defendant undertook to advance the levee, *the batture which had been forming was still below the surface of the water, and had to be artificially filled several feet before it became susceptible of private ownership.*" (Italics by the present writer.)

In Mathis v. Board of Assessors, 46 La. Ann. 1570, 16 South. 454, plaintiff sued to cancel an assessment against him for land lying in front of his property between the levee and the river. The court said:

"The character of such land is defined by the Code. The levee is deemed the bank of the river, and is that which contains the water at the ordinary high stage of the river. The ownership of the banks is in those who possess the adjacent land, but subject to public uses. C. C. 455, 457. * * *
"It is evidence * * * that the riparian proprietor, the plaintiff, placed a fence around the land. It is true the amount derived was inconsiderable, but still the fact is in the record that the riparian owner leased the property and received rent from tenants.
"Our courts have affirmed leases of batture

by riparian proprietors. * * * The ownership of such land, in a certain sense, is recognized by the Code, and in this case the rights of private ownership have been asserted by plaintiff. Under such circumstances we think the land is subject to taxation."

The ownership of the banks of a navigable river, as recognized by C. C. art. 455, and of the alluvion which is formed "*to any soil situated on the shore* of a river or stream," as recognized by C. C. art. 509, is qualified by the conditions imposed by those articles, and hence the right of use, in both instances, is in the public; but that right is also qualified by the terms in which it is reserved. The use must not only be a public use, but it must be the particular public use specified in the reservation, being, in the one case, that which is incidental to the navigable character of the stream and its use as an avenue of commerce, and, in the other, that "which is required by law for the public use," and which, where the stream is nonnavigable, is perhaps more restricted. And, save to the extent that it is so qualified, the ownership is as perfect as law can make it.

"The banks of the river," this court has said, "are not sold, but rather pass as an accessory of the land sold. Ripæ non venduntur, sed magis accedunt rei venditæ. Coepola de serv. rust. The property of the banks belongs to those to whose fields they are contiguous. Proprietas earum (riparum) est quorum prædiis hacrent. F.f. 1, 8, 5; Code Civil, 96, art. 8. They must be the property of the riparious owners, without being included or mentioned in their grants, for if they were only" theirs "when included there would be no use for the provision in the law; it would be idle. If, therefore, when the sovereign grants land, contiguous to the river, without mentioning the bank, this passes, it must do so as an accessory. If the bank pass as an accessory in the grant of the sovereign, it must also in the deeds of private persons. * * * If there be a public road between a field and the river, still that which is made by alluvion accrues to the field. Si meum inter agrum et fluvium interjaceat publica via tamen meum fieri quod alluvio adjicit. Grot. de Jur. Bell. et Pa. 2, 8, 17. Gronovii nota, 68." Morgan v. Livingston, supra, 6 Mart. (O. S.) 230.

"The alluvion, when attached to riparian property, becomes part of the property."

"The portion thus added is not considered as new land; it is a part of the old, which ac-

quires the same qualities, and which belongs to the same owner, in the same manner as the increase by the growth of a tree makes part of the tree." Cambre v. Kohn, 8 Mart. (N. S.) 576–577.

The right of use of such property (i. e., the banks of a stream and the alluvion attached to the riparian land) being vested in the public, its administration, for the purposes of that use, devolves upon the state, and is, ordinarily, committed by the state to the governing bodies of its various subdivisions.

In Dennistoun v. Walton, 8 Rob. 211, the defendant refused to pay rent for a batture that he had leased, upon the ground (among others) that it was part of the river's bank, the use of which was public, and hence was not susceptible of lease by and to an individual. The court found that part of the leased property consisted of a space between the public road and the levee, of which plaintiff was entitled to the exclusive use, and as to the part between the levee and the water it was said:

"The owner may use it, provided he does not prevent the use of it by others, as regulated by the article of the code above referred to, and in conformity to the police regulations. Our learned brother of the district court assumes that the police regulations * * * are a part of the law of the land and that the court is bound to notice them without proof. * * * Be this as it may, the owner has clearly a right to enjoy his property in a modified form, provided he conforms to the regulations of the police jury, and he may confer upon a lessee the same right."

In Carrollton R. Co. v. Winthrop, 5 La. Ann. 36, it appeared that plaintiff had leased the batture in front of its property to defendant, for a woodyard, and that defendant refused to pay the rent agreed on, upon the ground that the municipal authorities had subsequently designated the batture in question as a place for the keeping of woodyards, and had imposed and collected a tax upon the business there conducted by him. The court said:

"We have been referred * * * to the case of Municipality No. 2 v. New Orleans Cotton

Press [18 La. 122, 36 Am. Dec. 624] as decisive of this controversy. It appears to us that that case does not touch the question at issue. It was there held that our laws secure to the public the use of the banks of navigable rivers, and that within the limits of incorporated towns the municipal government is authorized to regulate that use, and to cause to be removed * * * works and constructions which interfere with it. But the regulations they make must be in furtherance of the specific public use to which the banks of rivers are subjected. L. C. 446. The conversion of a portion of the batture in front of the town of Carrollton into a woodyard is not one of those uses. * * * If the corporation had the right to establish woodyards, they would have an equal right to establish brickyards and sawmills; and by refusing to advance the present line of the levee they could enjoy forever, as owners, the property of the plaintiffs. The rule laid down in Dennistoun v. Walton, 8 Rob. 211, completely covers this case."

The doctrine thus enunciated was affirmed in Heirs of Duvergé v. Salter & Marcy, 6 La. Ann. 450.

In Lyons v. Hinckley, 12 La. Ann. 655, it appeared that defendant owned a tract of land in the town of Washington, on Bayou Courtableau, upon which (and immediately on the bayou) a tanyard had been established for many years, and that plaintiff sought to compel him to give a road across the same to a mill which he had erected further up the stream. It was held, with reservation of opinion as to the authority of the town in the premises, that plaintiff was not entitled to that which he sought. In the course of the opinion the court quoted C. C. art. 446 (now 455) and said:

"The character of the servitude which is due from the proprietors of the soil is here described, and, instead of being for the use of the public at large for all purposes, is only for that which is incident to the nature of the navigable character of the stream washing the land of such proprietor."

In Pulley & Erwin v. Municipality No. 2, 18 La. 278, it appeared that plaintiffs, as riparian proprietors of the adjacent land, owned a batture in front of the city, upon which, for the purposes of their business, they had erected various structures, and about which they had built a levee (outside of the public levee), and that defendant had entered upon the property and made large excavations in order to obtain sand for public use, whereupon the suit was brought to stop the alleged trespass, and for damages. It was held by the court as follows (quoting the syllabus) :

"The use of batture, outside of the levee, is vested in the public, but the ownership or title to the soil is vested in the front proprietors of lots, or the land to which the batture attaches or forms. The corporation * * * is the administrator of the use of the batture for the public, outside of the levee, and has the right of taking earth for the construction of embankments, levees, and wharves for the public use on the batture along its whole extent within the corporate limits, * * * and also for improving the port, and the streets and avenues leading to it."

Prior to 1853, the power possessed, in that respect, by municipal corporations in Louisiana was without specific restraint, and owners of property and others, feeling themselves aggrieved, either by the enforcement or the disregard of the police regulations, sometimes appealed to the courts for redress.

In Remy v. Municipality No. 2, 11 La. Ann. 161 (the action being for the recovery of batture property), the court, referring to the relation of the defendant municipality to the property claimed, said:

"The possession of the city is purely administrative, destined in its nature to terminate upon the happening of a certain contingency (which, in the case at bar, has already happened). It cannot, therefore, be pleaded against the riparian proprietor as the basis of an adverse title in the city. * * *

"The several acts of the Legislature, giving to the city police powers over the batture, were intended to enable them the better to enforce their administrative authority on behalf of the public, who were entitled to the use of the batture for the purposes of commerce; they were never intended to change or disturb the rights of property, and, had such been the intent and object of these statutes, they would, to that effect, have been nullities." (Italics by the writer.)

Being then the owner in sovereign right, and administrator of the public use, of lands, below the ordinary high-water mark, underlying the navigable waters within her borders,

with full authority to dispose of, or administer, them as she deemed advisable, subject to the limitations imposed by, and under the authority of, the Constitution of the United States, the state of Louisiana re-enacted laws, which had always been in existence, in the province and the territory, have been read into the title of every riparian estate that has ever been sold and bought within her boundaries, and have been construed by this court and its predecessor, the territorial court, for more than a century, and in which she declared and now declares that:

"Art. 453. Public things are those, the property in which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are * * * the beds of [navigable] rivers, as long as the same are covered with water. Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors."

"Art. 455. The use of the banks of navigable rivers or streams is public; accordingly every one has a right freely to bring his vessels to land there, to make fast the same to the trees which are there planted, to unload his vessels, to deposit his goods, to dry his nets, *and the like. Nevertheless the ownership of the river banks belongs to those who possess the adjacent lands.*"

"Art. 509. The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion. *The alluvion belongs to the owner of the soil situated on the edge of the water,* * * * who is bound to leave public that portion of the bank which is required by law for the public use."

"Art. 457. The banks of a river or stream are understood to be that which contains it in its ordinary state of high water. * * * Nevertheless on the borders of the Mississippi and other navigable streams, where there are levees, established according to law, the levees shall form the banks."

[2] It is to be remembered that this suit is brought by the state, in the capacity of owner, praying for judgment on the question of title, and incidentally for an accounting for the oil which defendants may have extracted from the land. There is no complaint that defendants, as owners of an alluvion, the formation of which is complete, but the use of which is still required by the public, are interfering with such use. The title set up is that the land claimed is part of the bed of a navigable river, the property of which is vested in the nation, and therefore inalienable, so long as the same is covered by the waters of the river in its ordinary state of high water.

The state of the water at which the land covered by it continues to be the bed of the river is, however, added in the argument. The law, as may be seen from the foregoing quotations, contains nothing to that effect. To the contrary, it declares that the *property of the river beds* is in the public only so long as the beds are covered by *water*; that the *banks* are understood to contain the waters of the river in its ordinary state of *high water*; that the ownership of the banks belongs to those who possess the adjacent lands; and, further, that the accretions to any soil *situated on the shore of the river* are called alluvion, and *belong to the owner of the soil situated on the edge of the water*—which would seem to indicate an abundance of caution on the part of the lawmakers in a most earnest effort to distinguish the land upon which the alluvion may be formed from that constituting the bed of the river, since they describe it not only as the "shore," but as "situated on the edge of the water," whereas the bed lies beneath the water. Those terms have been defined and are understood to bear the following meanings, respectively, to wit:

"Shore. * * * 1. The land bordering a body of water, esp. a large body. * * * 2. * * * Syn. Shore, coast, beach, strand, bank. Shore is the general word for the land immediately bordering on the sea, a lake, or a large stream." Web. Int. Dic.

"Shore. That ground which is between the ordinary high and low water mark. It does not include (when the king's title is the matter in question) land which the sea overflows at high spring tides or leaves bare only at extraordinary low tides. Hale, De Juris Maris, c. 4.

"When the seashore is the boundary, the meaning must be understood to be the margin of the sea in its usual and ordinary state; the ground between the ordinary high-water mark and low-water mark is the shore. Hence a deed of land, bounded at or by the 'shore' will convey the flats

as appurtenant. Stover v. Freeman, 6 Mass. 435. * * * In common parlance, the word 'shore' is understood to mean the line that separates the tide water from the land about it, wherever that line may be, and whatever the stage of the tide. The word 'shore,' in its legal and technical sense, indicates the lands adjacent to navigable water, which at high water are submerged, and at low tides are laid bare. Bell v. Gough, 23 N. J. Law, 624, 683. (All included in definition given in Abb. Law Dic.)

"Seashore is that space of land, over which the waters of the sea spread in the highest water, during the winter season. Civil Code, art. 452.

"Bed. * * * The bottom of a water course, or of any body of water, as the *bed* of a river. Web. Int. Dic.

"Bed. * * * 2. In reference to streams the bed is the channel in which the water runs; the soil which is so often covered by water as to acquire distinct character and feature from submersion."

Quoting:

"The banks of a river are those elevations of land which confine the waters when they rise out of the bed; and the bed is that soil so usually covered by water as to be distinguishable from the banks by the character of the soil or vegetation or both, produced by the common presence and action of flowing water. * * * " Howard v. Ingersoll, 13 How. 381, 14 L. Ed. 189. (Included in definition in Abb. Law Dic.)

The argument of the learned counsel for the state confuses the banks of a river with its bed, assigns no place to the "shore," and reduces to an empty sound, not only the title to the alluvion, which the *law, in explicit terms*, vests in the owner of the soil on the shore to which it is formed, but the title to the soil itself, which the law, in terms equally explicit, recognizes; for, if all the land between the banks, when the river is in its ordinary state of high water, constitutes the bed, then the shore and the bed are one and the same, the soil situated on the shore is situated in the bed, and the *accretions formed on the soil and called alluvion are formed on, and become part of,* the bed. The property of the bed is, however, in the public, and inalienable, only so long as the bed remains covered by water; and, when the water leaves the bed, as such uncovered, its ownership is regulated by provisions of the state law to the effect that,

if the river finds another bed, the owners of the soil thus occupied take the old bed; if the bed be only partially uncovered, and an island be formed in a navigable stream, it belongs to the state, or, in a stream not navigable, to the owners of the lands upon either side.

Under article 453 and articles 455 and 509 of the Civil Code, it is clear, as to accretions formed upon the soil of the shore, that, if they be regarded as part of the bed, and not of the bank while below the surface of the water, and hence, as land, the property of which is in the public, a new condition arises when they emerge from beneath, and become part of the shore above, the surface of the water; that the title thereto of the riparian owner then becomes vested, and the title of the state devested; in other words, the one title, at that moment, comes into, and the other goes out of, existence.

We have examined the French authorities, and find them much divided, though the majority, perhaps, sustain the view of plaintiff's counsel; but, conceding that to be true, the French law, upon the question here at issue, differs in so many respects from our own that commentaries thereon find little or no application in this case. Article 556 of the Code Napoléon differs from article 509 of our Code, and, on a close construction, we are inclined to think, materially. The Code Napoléon contains no article defining the banks of a stream, and none declaring the ownership of the banks to be in the adjacent proprietors. To the contrary, its article 538 declares (among other things) that "rivers and navigable streams * * * and, generally, all parts of French territory which cannot become private property are considered as forming part of the public domain," which language we take to include the banks of rivers. Beyond that, the rivers of France have a stability which ours have not, and natural banks, which, for the most part, so

far as we are informed, require no levees, and hence, in France, they have no laws constituting the levees the banks of the rivers, and providing that they shall be laid off and constructed when and where the state may think proper, and may include between them, if found necessary, the whole of a plantation or estate.

The American decisions, to which we have been referred, determine, for the purposes of the cases decided, what constitutes the ordinary level of high water in different rivers, a matter which, as we have endeavored to show, has no immediate bearing upon the issues here involved. Our conclusions may then be stated as follows.

The state of Louisiana, in virtue of her sovereignty, became the owner of all lands underlying the navigable waters within her territory, below mean high-water mark, with power to determine the rights of riparian proprietors with respect thereto, subject only to the limitations imposed by, and under, the Constitution of the United States; and, in the exercise of that power, she has enacted laws which have been read into the titles of all lands bordering upon such waters and which declare, in effect, that the property of the beds of navigable streams is in the public, so long as they are covered with water; that the banks are "that which contains" the river, in its ordinary state of high water, and belong to the adjacent proprietor, subject to a servitude of use in favor of the public; that the accretions which are formed, successively and imperceptibly, to any soil constituting the shore of any river or stream, are called alluvion, and belong to the owner of such soil, who is bound to leave public that portion of the bank required by law.

Construing those various provisions of the law together, and with reference to the doctrine, here propounded on behalf of the state, that all lands between the banks of a river, below mean high-water mark, constitute its bed, it is evident that the law and the doctrine cannot stand together, and equally evident that, in the enactment of the law, the state has not intended that they should stand together, but has established an exception to the doctrine, and such is the well founded and settled jurisprudence of this court, from which it appears that batture and alluvion, lying between the banks of navigable rivers, below the ordinary stages of high water, have been, for a century and more, occupied, leased, mortgaged, sold, and litigated over, as property the title to which was vested in individuals and private corporations; that, in no case, has this court ever held, or intimated, that an alluvion which was shown to appear above the surface of the water, at its ordinary stage, with a reasonable appearance of permanence and identification with the soil of the shore, was part of the bed of the river, or for that, or any, reason was not susceptible of private ownership; or that the question of the existence of such alluvion was controlled by its relation to the ordinary stage of high water; nor has the court ever failed to hold that such existence and the susceptibility of the alluvion to private ownership were sufficiently established when it was shown that it appeared above the surface of the water, at its ordinary stage, and had assumed a permanent character as part of the shore.

We further conclude that the land here claimed constitutes alluvion which has so appeared above the surface of the water at its ordinary stage; that it is susceptible of private ownership and belongs to the defendant as the owner of the soil of the shore to which it is attached, subject only to the right of use established by law in favor of the public; and hence that the question of the exact location of the high-water mark, to which the counsel and the learned judge a quo have devoted much attention, is immaterial to this inquiry. We also conclude

and find that no question of interference by defendant with the use of the land in controversy which the law reserves to the public is involved in this litigation. And we find no error in the judgment appealed from, whereby the demands of the state are rejected and the defendant is recognized as the owner of said land, lawfully in the possession and enjoyment thereof, which judgment is accordingly

Affirmed.

## On Application for Rehearing.

LAND, J. The land in dispute is a tract situated within a bend of Red river in the parish of Red river.

The state brought a petitory action against the defendants as actual possessors of said premises, who, as alleged in the petition, had entered thereon, and drilled and operated a number of wells, from which they were daily extracting large quantities of oil.

The state in said petition based her claim of ownership on the allegation that said tract in section 24, township 13 N., range 11 E., is "the bed of Red river" and "within the banks of said stream below ordinary high-water mark."

The state claimed to own all the oil produced and to be produced on said tract of land, and caused the same to be sequestered.

The defendant Richardson in his answer specially denied the alleged ownership of the state, and averred that he is the true and lawful owner of lands fronting on Red river in said section, and had leased the same for development for oil and gas; said lease embracing the land actually owned by said Richardson, but not including any land owned by the state.

The bend of Red river in which the land in dispute is situated is now called Gusher Bend, but was formerly known as Stallings' Bend.

Judge J. C. Pugh, prominent lawyer and planter, testified that practically all of Gusher Bend is in cultivation, except a slough, such as is common in alluvial territory.

E. T. Robinson, planter, testified that he had been familiar with Stallings' Bend, now Gusher Bend, all his life; that at the date of the trial there were some 40 or 50 oil derricks in operation on the land, and a number of roads used for the purpose of hauling materials, machinery, and pipes; that a portion of the land was in cultivation, another portion had been used as a pasture, and there was nothing to prevent the cultivation of the whole, except a few depressions "common on the river."

The same witness testified that the Gusher Bend land was no lower than his own plantation situated on the opposite side of the river.

J. C. Marston, planter, who had known the Gusher Bend for about 25 years, testified to the same effect, and that 90 per cent. of the land in that bend could be cultivated, and that sloughs could be prepared for cultivation by filling in and ploughing out and draining.

The district judge, after stating in his opinion the contention of the state as to the slough referred to by the said witnesses, proceeds as follows:

"Only a few parts of this low ground lie below ordinary high waters, and they are not inundated until the river passes beyond the ordinary high-water mark."

The judge then cites Civil Code, art. 457, reading:

"The banks of a river or stream are understood to be that which contains it in its ordinary state of high water, for the nature of the banks do not change, although for some cause they may be overflowed for a time."

The judge, after referring to a certain map filed in evidence, showing the present river, and the river as per United States survey of 1830, states that the map "makes it plain that only a small part of the property claimed by the state in this case was ever the bed of the river as it formerly existed,"

and the low parts of the "bay" as indicated by pictures of the different wells were original ground as shown by the locations of these wells on said map.

The judge further states that these facts would be sufficient to nonsuit the state, but proceeded to consider the case upon the conflicting levels of elevation reported by different engineers, and, finally, rendered judgment rejecting the demands of the state, with costs, and recognizing defendant's ownership of certain described lands in S. ½ of section 24, township 13 N., range 11 W., Red river parish, lying above 145.24 Cairo datum, on the river front of secretion bank, this including all lands lying between said contour line and the old original bank.

The state does not contest the ownership of Richardson in section 24, except in so far as such property is not susceptible of private ownership.

The state in her brief claims the ownership of the bed of Red river in Red river parish below ordinary high-water mark, and particularly the land within the banks of Red river below ordinary high-water mark in said section 24.

The land in controversy is between the present banks of Red river, and in 1830 only small portions of the same constituted a part of said stream.

It is obvious that the present bed of Red river cannot be extended by any kind of construction, legal or otherwise, beyond the banks which contain the stream. C. C. art. 457.

After a careful review of the law and jurisprudence applicable to this case, this court, in the opinion handed down by the Chief Justice, reached the conclusion that the doctrine that all lands between the banks of a river below mean high-water mark constitute its bed cannot be reconciled with the positive provisions of the Civil Code, vesting the ownership of river banks in those who possess the adjacent lands, and also vesting in such riparian proprietors the bed of streams, when sufficiently elevated by successive accretions to form batture susceptible of private use.

It is well settled that the definitions of our Civil Code are controlled by the clear intent of the positive enactments. Ellis v. Prevost, 13 La. 237; Egerton v. Municipality No. 3, 1 La. Ann. 435.

The conclusion thus reached, and which we see no good reason to change, disposes of this case as presented in the petition of the state.

The belated contention of the state, that she is entitled to the bed of the slough, because it formed a part of the bed of the river in 1830, is not presented by the pleadings, except indirectly as a part of the general claim of ownership.

But where a river or stream changes its course, and opens a new bed, the owners of the soil newly occupied take the former bed of the river. Civil Code, art. 518.

Rehearing refused.