DIXON, Judge
(dissenting).
In spite of the volume of evidence in this case, there is very little dispute as to the relevant facts. Prior to the flood of 1945, Sunflower Plantation lay on the left descending bank of Red River, and extended as a finger of land toward the west, forming, with the river, Dixie Bend. The neck of the finger was considerably narrower than its westerly side, which was formed by sandy deposits from the river.
Immediately downstream from Sunflower Point lay Eagle Point Bend. Eagle Point Bend and Eagle Bend Plantation lay on the right descending bank of Red River, extending its point in an easterly direction. The point of this projection also consisted of sandy deposits from the river.
Photographs in evidence show how the land lay with reference to the river before and after the highest waters of the flood. One photograph taken about March of 1945 shows a large portion of Sunflower Point under water. It also shows a portion of the sand bar at Eagle Point Bend under water, and a portion above water.
Other aerial photographs were taken about July of 1945. They demonstrate that what had been Sunflower Point had been scoured by the river, which had cut off the peninsula. Just as clearly, the photograph demonstrates that Red River had formed itself a new channel at Eagle Bend. Its channel now lay across Eagle Point Bend a considerable distance from its old bed. Its old bed is clearly identifiable, and by July of 1945 the northerly end of the old bed of Red River at Eagle Point Bend was dammed up by deposits of sand and silt.[1] The southerly end of the old bed of Red River at Eagle Point Bend (and at Dixie Bend) remained open to the main channel of Red River until some later date, when it was also closed tip by the action of the river.
The change in the course of the river across Eagle Point Bend occurred some time after April 1, 1945 (the date on which the cutoff at Sunflower Point was completed) and at a time when the flood waters of the river completely hid from view an area at Eagle Point Bend which spread from the old bed of the river on its left high bank to the high ground of Eagle Bend Plantation, which formed a high bank on the westerly side after the flood waters declined.
Stewart, as plaintiff in reconvention, has proved his title to all the land involved in the Eagle Point Bend. He claims the bed *590 of Old River at Eagle Point (now a lake) under the provisions of C.C. 518:
“If a river or stream, whether navigable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost.
“They shall again take their former property, if the river or stream returns to its former channel.”
His demands have been rejected, and this court holds that before the provisions of Article 518 can avail him, he must prove that there was a “cutoff” resulting from “avulsive action” of the river.
This is the first case in Louisiana jurisprudence to interpret Article 518 as requiring proof of “avulsion,” or of the creation of a “cutoff.”
Before us is a situation in which a point was covered by flood water. When the waters receded, the river had opened itself a new channel. The new channel now occupied space formerly occupied by lands of Eagle Bend Plantation, both inside and outside of the levee. The middle of the new river bed was where part of the levee had been. The old bed of the river remained, and was clearly identifiable. Photographs depicting the action of the river were taken in March and July. During most of this period, the river was at a high stage.
The plain words of Article 518 would seem to give the owner of Eagle Bend Plantation the old bed of Red River in exchange for the new bed which now lay across space on earth formerly occupied by Eagle Bend Plantation and the alluvion which lay between Eagle Bend’s high bank and the bed of Red River.
Under the constant jurisprudence of this state, the land that lay between the high banks at Eagle Point Bend was subject to private ownership. It was identifiable, stable and permanent enough to appear regularly on maps and photographs. State v. Richardson, 140 La. 329, 72 So. 984 (1916), stands for the proposition that the owner of the bank adjacent to a river owns the soil that lies between the bed of the river (that portion of the river covered by water at its ordinary low level) and the high bank. It was there held that accretion between the high bank and the river bed is not owned by the state, as forming a part of the bed of the river, but belongs to the owner of the land which lies adjacent to the river.[2]
The cases which have been cited to support the new law that “avulsion” or “cutoff” is necessary before Article 518 applies are: State v. Richardson, supra; Strohecker v. Robinson, 147 La. 652, 85 So. 627 (1920); Fitzsimmons v. Cassity, 172 So. 824 (La.App.1937); Russ v. Stephens, 90 So.2d 501 (La.1956); Stephens v. Drake, 134 So.2d 674 (La.App.1961); Anderson-Tully Co. v. Tingle, 166 F.2d 224 (8 Cir., *591 1948); Uhlhorn v. U. S. Gypsum Co., 366 F.2d 211 (8 Cir., 1966).
There is absolutely nothing in State v. Richardson about a “cutoff” or “avulsion.” This case arose in Red River Parish and involved the ownership of land that lay between the river at low stage and the high bank. There is a sketch of the land involved at 72 So. 984. This was a peninsula known as Gusher Bend, because of the existence of numerous producing oil wells on the property.
The whole case involved a determination of whether the state owned everything between the high banks of a river. The court held that the state owned only the bed of the river, that the adjoining property owners owned the high banks and all the allu-vion that lay between the bed and the high bank. The bed of the river was said to be that portion of land which was always covered by water.
On the application for rehearing, there was a reference to a “belated contention of the state” that she was entitled to the “bed of the slough” because it had been river bed in 1830. The court held that the question was not presented by the pleadings, and referred to the provisions of Article 518 almost parenthetically, as if that article would have disposed of the state’s contention adversely to the state.
In Strohecker v. Robinson, there was a “sudden meeting of the waters,” but the case was not appropriate for the application of C.C. 518. The land involved in the Strohecker case was, to a great extent, what had been the new bed of the river when it broke through the neck of a peninsula. After breaking through, the river gradually migrated, leaving the accretion which was the subject of this litigation.
The court said at 85 So. 629:
“The major part of the area in controversy is space that was occupied by the river when it had acquired a double width by the caving in of the narrow partition between the two beds of the river. That space, however, was not acquired by the plaintiffs by virtue of article 518 of the Code, because the river did not, as an immediate result of the break in the bank, ‘open itself a new bed by leaving its former channel.’ The former channel was not left vacant, but the two beds of the river came together, occupying as much space as they had occupied before. The double-width river bed east of the levee was thereafter vacated by the water, not by the sudden process described in article 518 of the Code, but by the gradual process described in articles 509 and 510; that is, by the process of accretion, the formation of alluvion, or leaving dereliction, formed by the running water retiring imperceptibly from its newly built west shore and encroaching upon its east shore.”
The court in the Strohecker case simply held that the land involved was not the old bed of the river. Article 518 therefore did not apply. It can hardly be said that the Strohecker case stands for the principle that there must be a classic “cutoff” or an “avulsive” action before C.C. 518 will apply.
There is nothing in Fitzsimmons v. Cassity about “avulsion.” This case involved a duck blind in an “Old River Lake.” Red River made a bend to the west. There was a survey in 1839 and 1872. The neck of the peninsula at the time of these surveys measured approximately 2700 feet. In 1873 the raft above the City of Shreveport was removed and the water returned to the river’s main stem and increased the velocity of the river current. The court said on page 826 of 172 So:
“Gradually, though surely, the river on the north side of the peninsula moved southerly, absorbing from time to time by erosion the acreage in the bend. * * * “It was evident to all observers that insensibly, though definitely, the elimination of the river around the peninsula as a part of its active channel was in the making * * *.”
*592 By 1920 the neck of the peninsula had been reduced to about 286 feet, at which time the levee board dug a cutoff. The river soon occupied the cutoff as its new channel, abandoned the old bed of the river which was silted up so that it impounded water and became a shallow lake. It was the contention of the defendant, who wanted to hunt ducks on Old River Lake, that it was still part of the bed of Red River, and was public property.
The court held that, under the provisions of Article 518, the owner of the land through which the new channel was cut became the owner of the old bed of the river.
Russ v. Stephens involved the same flood which created the difficulty presently before us. The case does not hold that there must be a cataclysmic avulsion before C.C. 518 applies. This was a slander of title suit decided by Judge Ayres. The Loftin Place was owned by the defendants. It formed a peninsula extending into Red River.
“During an unusually devastating flood occurring in April, 1945, Red River cut a new channel or bed through the base of the aforesaid peninsula, taking property of defendants for such new course. The ends of the old channel were sanded over and the old bed formed a lake.” (90 So. 2d 502).
To support his claim of possession as owner, the plaintiff contended that the Loftin Place peninsula, which had become a virtual island, belonged to the plaintiff by accretion. The court found that the course of the river was changed abruptly during a flood, opening itself a new branch. Since the land claimed by the plaintiff was not formed successively and imperceptibly, it was not accretion, and did not belong to the plaintiff.
If anything, Russ v. Stephens supports the claims of Stewart, who is in a position like Stephens. Dickson’s claims are like those of the plaintiff Russ, whose demands were rejected.
In Stephens v. Drake, the only mention of a “sudden irruption” was in connection with an argument the defendant had made with reference to C.C. 511, referring to land carried away and deposited lower down the river.
Stephens v. Drake was a controversy over a half mile wide sand bar that lay between an oxbow lake which had been the old bed of Red River and some other land of the plaintiffs’. The court stated at 134 So.2d 675:
“In 1945 the Red River overflowed its banks in many places and during this overflow cut a new channel across the base of the peninsula and in succeeding years both ends of the old channel silted up completely, sealing it off from the flow of water from the Red River.”
It was not the bed of the old channel of the river that was at issue. The court said at 134 So.2d 676:
“It is thus clear that appellant limits his claim to the detached strip of land which had been a peninsula and any allu-vion that had become attached to his land.”
The land involved was referred to in more than one place in the opinion as a “sand bar one-half mile in length.” The court held that Article 518 controlled and since the river had found itself a new channel, the former owners of the sand bar did not lose it merely because the river had placed itself between the sand bar and the balance of the lands of the former proprietor. The case supports the claims of Stewart.
Stephens v. Drake also held that the owner whose land lies on the left descending bank of the river, and who finds himself with land on the bank of an oxbow lake, cannot acquire accretion which forms between the oxbow lake and the stream because “it has long been the law of this state relating to the rights of riparian owners that accretion or alluvion is limited to lands abutting a river or other stream and *593 have no application to lakes.” (134 So.2d, 677).
Anderson-Tully v. Tingle is a Mississippi lawsuit to decide the ownership of accretion formed at “Brown’s Point,” which apparently lay at the juncture of the Yazoo River and the Mississippi River. The court applied a “center of the stream” or the “thread of the current” or the “thalweg” theory to determine the boundary and the ownership of the alluvion.
The problems and the principles involved in the Anderson-Tully case are completely foreign to the Dickson case and to the law of the State of Louisiana.
The court does make the statement that “where a river is a boundary, and there is no avulsion, a landowner can never cross the river to claim an accretion on the other side.” This case is not exemplary of the law of the State of Louisiana.
Uhlhorn v. U. S. Gypsum is a contest over a towhead in the Mississippi River between Tennessee and Arkansas. The case involved boundaries of states, the “thalweg” theory and an “island rule” argument.
It is hard to understand how any of the matters contained in the Uhlhorn case could be applicable to the case before us. Neither Uhlhorn nor Anderson-Tully should be treated as authority for the determination of a petitory action wholly within our state and wholly provided for by the law of our state.
Since the river here has opened itself a new bed, and has left its former channel, appellant should now own the old bed of the river, and should not have lost the ownership of the land lying between the new and old beds. The Louisiana authorities cited seem to require this conclusion, and the foreign authorities ought not be conclusive.
The judgment of the district court should be reversed.
Rehearing denied.
DIXON, J., dissents from refusal.

. The same photographs which show the old channel at Eagle Point silted up at the upstream end and open at the downstream end show the identical condition at Dixie Bend — the old channel which had flowed around Sunflower was silted up and closed at the upstream end and open at the downstream end.

. “Construing those various provisions of the law together, and with reference to the doctrine, here propounded on behalf of the state, that all lands between the banks of a river, below mean high-water mark, constitute its bed, it is evident that the law and the doctrine cannot stand together, and equally evident that, in the enactment of the law, the state has not intended that they should stand together, but has established an exception to the doctrine, and such is the well founded and settled jurisprudence of this court, from which it appears that batture and al-luvion, lying between the banks of navigable rivers, below the ordinary stages of high water, have been, for a century and more, occupied, leased, mortgaged, sold, and litigated over, as property the title to which was vested in individuals and private corporations; that, in no case, has this court ever held, or intimated, that an alluvion which was shown to appear above the surface of the water, at its ordinary stage, with a reasonable appearance of permanence and identification with the soil of the shore, was part of the bed of the river, or for that, or any, reason was not susceptible of private ownership; or that the question of the existence of such alluvion was controlled by its relation to the ordinary stage of high water; nor has the court ever failed to hold that such existence and the susceptibility of the alluvion to private ownership were sufficiently established when it was shown that it appeared above the surface of the water, at its ordinary stage, and had assumed a permanent character as part of the shore.” 72 So. 991.