WILLIAMS, Judge.
C. Bickham Dickson, Jr., individually and on behalf of his two minor sons, Michael Augustus Dickson and C. Bickham Dickson III, filed the original suit herein. It was a possessory action and there were 23 defendants named. The evidence at the trial of this possessory action established that for many years the Dicksons and their authors in title, or their ancestors from whom they inherited, owned and were in actual possession of the Sunflower Plantation located on the east, or the left descending bank of Red River. Prior to the year 1945 the Red River, following its serpentine course through the Gulf Coast Plain, caused in its meandering a series of sharp, reverse and irregular curves. Red River enters the state of Louisiana near the northwest corner thereof and, as it flows southeastward, serves as the boundary between the parishes of Caddo and Bossier. As the Red River flows along its long and twisted route approximately 1200 miles toward the Mississippi it carries with it sediment gathered by erosion from the red soils characteristic of this alluvial basin. The density of the sediment carried varies with the fluctuating stages of this river. At times of high water or flood stage the density of this sediment is greatest due to the rapidity of the flow of the river and the soluble qualities of the soil along its shores. At flood stage it becomes a deep, dirty red color. Observing this river at such a stage it is apparent that the name Red River is most appropriate.
A few years before 1945 the Board of Commissioners of Caddo Levee District attempted to straighten the channel of Red River by making cutoffs across two tracts *581 of land located about one mile above Sunflower Plantation, known as the Shreve Island cutoff. There already existed a peninsula tract, a portion of Sunflower Plantation, projecting in a westerly direction. (See Exhibit A). The course of Red

EXHIBIT A
A photograph of Sunflower Plantation and Eagle Bend Plantation in 1944.
River as shown on Exhibit A, after reaching Sunflower Plantation, made a sharp turn to the west, a sharp southern turn, thence southeast, east and northeast. Thereafter the river made another sharp turn to the south around the east tip of Eagle Point Bend or what is part of Eagle Bend Plantation. The Shreve Island cutoff increased erosion of the base of the peninsula portion of Sunflower Plantation. The Dicksons’ ancestor in title C. Bickham Dickson, Sr., had previously sought damages from the Board of Commissioners of Caddo Levee District for this increased erosion caused by the alleged artificial current created in the river. Dickson v. Board of Com’rs of Caddo Levee District, 210 La. 122, 26 So.2d 474 (1946). He was indeed correct in his prediction that in due time the caving of the banks along the *582 north portion of Sunflower Plantation would eventually result in a cutoff across this tract. In the Spring of 1945 there occurred a devastating flood on Red River. The water reached a record height and covered the entire peninsula of Sunflower and all of the eastern area of Eagle Bend Plantation. Because of this tremendous volume of water and the constant erosion of the levee system along the west side opposite Sunflower there was a serious threat of inundation to Dixie Gardens, a thickly populated area of Shreveport. A constant watch of this area was maintained by those in charge of the flood protection work. Thus it was quickly observed that on April 1, 1945 the Red River had eroded through the middle portion of the Sunflower Plantation peninsula. Witnesses for all parties concerned agree on this. The avulsive action of Red River in causing this cutoff or breakthrough of Sunflower Plantation resulted in a flow of water around the west portion of the former peninsula and similarly through the cutoff. These waters met in the channel just south of Sunflower Plantation and north of Eagle Bend Plantation.
After the cutoff across Sunflower Plantation the river continued to rise and within several days after April 1, 1945 reached its peak flood stage, remaining at this height for several weeks. By July 1945 the waters had receded to such an extent that its new course across the cutoff at Sunflower Plantation was easily discernible. The effects of the high water and position of the river channel along the north and east front of Eagle Bend Plantation were then evident. (See Exhibit B).

EXHIBIT B
In the foreground is depicted Sunflower Plantation. The circled wooded area was identified as a portion of Sunflower. In the background is depicted Eagle Bend.
*583 Among defendants in the original pos-sessory action was Norman D. Stewart, owner of Eagle Bend Plantation, who answered the possessory action and filed a reconventional demand in which he claimed the ownership of all the land lying between the present channel of Red River (now existing along the north and east side of Eagle Bend Plantation) and the eastern edge of the channel of Red River as it existed prior to April, 1945. Stewart’s demand claimed ownership of land claimed by the Dicksons and also land claimed by others who had entered into an act of partition with the Dicksons in the year 1958. Made defendants were all parties to said partition, namely: Antoinette Wyche Burt, Antoinette Burt Sentell, August L. Sen-tell, Youree A. McCall and Leslie A. Cowley. In answer to Stewart’s reconventional demands the above named parties each claimed to be owners and in possession of those areas received by each in the 1958 partition. The reconventional demand is a petitory form of action. It does not, however, affect the Dicksons’ possessory action with reference to the lands there involved and being a portion of Sunflower Plantation.
The trial court rendered judgment in favor of the Dicksons in their possessory action, and for the Dicksons and their co-defendants in reconvention on the re-conventional demand of Stewart. The defendants in the possessory action brought by the Dicksons have not taken any appeal from the trial court’s judgment in favor of the Dicksons, with the exception of Norman D. Stewart. .Therefore, this court is not concerned with the original or pos-sessory action by the Dicksons because:
1. All of the named defendants in the possessory action failed or did not choose to perfect an appeal therefrom except Norman D. Stewart, and therefore the judgment of the District Court is final as to them;
2. Counsel for Norman D. Stewart in his brief states:
“While Mr. Stewart has appealed from the entire judgment, this appeal is concerned primarily with the re-conventional demand for ownership of the property on the Bossier Parish side of the river. Briefly stated, Mr. Stewart’s position on the pos-sessory action is that if the court holds that he owns the lands in dispute on the Bossier Parish side of the river, then Mr. Dickson is entitled to a judgment on the possessory action.”
In addition to the above statement by counsel for Stewart his entire brief is directed to Stewart’s reconventional demand. This court does not wish to leave unmentioned the splendid briefs filed by counsel for all parties involved.
The record, though voluminous (7 volumes totaling 1468 pages, 200 exhibits) was extremely interesting and graphically pictured the crisis confronting the area and people affected by the great flood of 1945.
Stewart’s reconventional demand is a petitory action and he admits that the defendants in reconvention are in possession of certain lands to which he claims title.[1] Accordingly Stewart must bear the burden of proof, that is, make out his title thereto.[2]
Stewart asserted that during the 1945 flood and as a direct result of the Red River opening a new bed or cutoff through the Sunflower peninsula, that a similar opening of a new bed or cutoff occurred across Eagle Bend Plantation. Stewart alleged that a portion of his land, formerly on the west bank of Red River, was left on the east or left descending bank of Red River as a consequence of the action of the river in opening itself a new bed *584 or channel. Thus, after the passage of some 22 years, Stewart claims that Red River by what is termed an avulsive action, suddenly and perceptibly opened a new bed or channel through his land thereby making a cutoff of a part of Eagle Bend Plantation and placing it on the east or opposite side of the river from its previous location.
Stewart asserts that the right of ownership is vested in him under the provisions of LSA-C.C. Art. 518 which states:
“If a river or stream, whether navigable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost.
“They shall again take their former property, if the river or stream returns to its former channel.”
The rights here claimed by Stewart are an exception to the general rules of al-luvion and accretion enunciated by our Louisiana Civil Code in the following articles :
“The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.
“The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use.”
[LSA-C.C. art. 509]
“The same rule applies to derelictions formed by running water retiring imperceptibly' from one of its shores and encroaching on the other; the owner of the land, adjoining the shore which is left dry, has a right to the dereliction, nor can the owner of the opposite shore, claim the land which he has lost.
“This right does not take place in case of derelictions of the sea.”
[LSA-C.C. art. 510]
For Stewart to be successful in sustaining his claim, it is necessary for him to prove that the action of Red River during the 1945 flood was as asserted by him.
Article 518 covers within its terms avul-sive action of a river that results in a cutoff. In the case of Uhlhorn v. U. S. Gypsum Company, 366 F.2d 211 (8 Cir., 1966) the court set forth the rule of avulsion to be:
“The rule of avulsion is also settled and was articulated by the Supreme Court in State of Nebraska v. State of Iowa, 143 U.S. 359, 361, 12 S.Ct. 396, 397, 36 L.Ed. 186 (1892):
‘It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, “avulsion.” * * *’” [366 F.2d 211, 217]
This avulsion principle has been applied by at least three decisions of our Louisiana Courts in considering LSA-C.C. art. 518. See Stephens v. Drake, 134 So.2d 674 (La. App.2d Cir. 1961); Fitzsimmons v. Cassity, 172 So. 824 (La.App.2d Cir. 1937) and Strohecker v. Robinson, 147 La. 652, 85 So. 627 (1920).
The rule of avulsion is an exception to the principle of accretion enunciated in LSA-C.C. art. 509. To the owner of land along the bank of a river the principle of accretion is of utmost importance. This is particularly true where the river, such as the Red, is constantly changing its shore by erosion and deposition. Many Louisiana cases have recognized and applied the doctrine of accretion. Our courts have uniformly followed LSA-C.C. art. 509 in *585 holding that accretion is that which is formed successively and imperceptibly to any soil situated on the shore of a river or other stream, and is called alluvion, and that such alluvion in turn belongs to the owner of the soil situated on the edge of the water, subject to certain obligations for the public use.
Thus we see that under the principle of avulsion there must be a sudden and perceptible change in the course and channel of the river. This is the opposite of the principle of accretion where the soil or alluvion is added to the riparian land gradually and imperceptibly by deposits from the water to which the land is contiguous. The principles set forth in our Civil Code with reference to the rights of the riparian owner of land have a long and uniform history.[3]
Accretion to the land of the riparian landowner changes that owner’s boundary line. Avulsion or cutoff does not change the boundary line of the landowner affected thereby. In order for a landowner to cross the river and claim accretion on the opposite side there must be an avulsion or cutoff. Anderson-Tully Company v. Tingle, 166 F.2d 224 (5 Cir., 1948). With the principles of avulsion and accretion above set forth and in the cases cited, this court must now determine their applicability to the facts in this case.
The evidence presented by Stewart was represented by many photographs and maps of Eagles Point Bend and Eagle Bend Plantation, showing position, outline and conformation of the lands prior to and after the 1945 flood.
Stewart produced two witnesses. Leo M. Odom, who was Chief Engineer for the Louisiana Department of Public Works in 1945, stated that based on his knowledge the exhibits indicate that a cutoff occurred across the point of Eagle Bend Plantation. Mr. Odom stated further that he could not say precisely where Red River initially struck Eagle Bend Plantation after the cutoff occurred at Sunflower and that his official report made of the 1945 flood made no mention of a cutoff at Eagle Bend Point but did list the cutoff at Sunflower.
John R. Bowman, a civil engineer, was Stewart’s second witness. Bowman testified that on the basis of his examination of the exhibits showing a lack of erosion on the east bank of Red River, it was his opinion that a cutoff took place and that the force of the river did not seem to be against the east or left descending bank but where the cutoff took place across Eagle Bend Point. He expressed his lack of knowledge as to how long a time such a cutoff would have taken.
William A. Grabill, an aerial photographer, and a witness on behalf of Stewart, expressed his lack of knowledge of a cutoff over Eagle Bend Point. He stated that in his opinion the channel of the river changed and started a more westerly cut through the sand. Stewart frankly stated the entire area was under water for many weeks in the spring of 1945 and that “No one knows just what did happen.”
The Dickson group presented many photographs, maps, documents of the area and testimony of several lay and expert witnesses.
Austin B. Smith, a potamologist, demonstrated his expertise in this field by giving his opinion of the action of Red River at Eagle Bend Point. Mr. Smith has qualified as an expert in several other cases involving questions of avulsion or accretion.[4] *586 Smith determined from his examination of the exhibits and on the ground inspection of the area that there was no cutoff across Eagle Bend Plantation. He testified that following the “textbook” cutoff at Sunflower that Red River had a heavy load of sand and it created conditions that caused the river to move rapidly out of the channel at Eagle Bend Point and erode away the sand at Eagle Bend Plantation and form accretion along the Bossier Parish side or the left descending bank of Red River. He prepared an exhibit to illustrate the westward migration of Red River out of its channel existing prior to the Spring of 1945 and testified that this channel was sanded over at its upper end with some water remaining at the lower end which he described as a “slough” and now ponded water.
Smith further stated that as the current of the river passed through the cutoff at Sunflower it met the current flowing in the channel around Sunflower. The meeting of these currents would produce a vector effect and prevent a direct attack by the currents against the north side of Eagle Bend Plantation. Additional reasons for his conclusions were that he found no evidence of a high point bar existing on the east or left descending bank; that along the bank he found swales and sand ridges as evidence of the forming of the accretion.
Smith positively stated, based on his studies and examination of the materials and exhibits and his personal inspection of the land in dispute; that Red River did not effect a cutoff or avulsion across Eagle Bend Plantation during the flood of 1945.
Jessie C. McLemore, a land surveyor, surveyed the land in 1957, and, from this study and examination of the exhibits, concluded as did Smith that there was no cutoff but only that two currents joining “quickly eroded Eagle Point Bend or the sand bar portion of Eagle Point Bend. * * * ” Several lay witnesses stated that to their knowledge they were very familiar with the area in question and had never heard of any such cutoff.
Gordan Van Hoose described Eagle Point Bend as being a sandbar, stating: “Sometimes these sandbars, the minute the water hits them, they take off, just like sugar.” Youree McCall testified that when the water receded in 1945 it left “a bunch of slush that was a part of the river. * * ”
Finally, Dr. Richard K. Spears, Jr., Associate Professor of Biological Science at Louisiana State University, testified that he had examined the tree growth on the land in dispute and that the oldest tree found was a willow which commenced growth in the summer of 1945. No older vegetation was found by him.
A careful review of the extensive record and of the briefs, together with our study and examination of the exhibits filed herein, convinces us that Stewart has not sustained the burden of proof in establishing that there was an avulsive action of Red River in the spring of 1945 resulting in a cutoff on Eagle Bend Plantation. To the contrary we are convinced that the analysis and conclusions reached by expert and lay witnesses for the defendants in reconvention are consistent with what occurred, that is, the addition to the east or left descending bank of Red River was gradual and imperceptible and therefore accretion, and that such alluvial deposit belongs to the owners of the river banks to which it is attached.[5]
*587 Stewart has in this court raised the question of his right to the lands in question based on the theory that said lands were only temporarily submerged and when the water receded the property re-emerged and that on the re-emergence of said lands Stewart was entitled to ownership thereof under the holding in the case of Hughes, et al v. Birney’s Heirs, et al, 107 La. 664, 32 So. 30 (1902). Such an argument is not convincing. This court holds that the land areas in question were and are accretion and therefore not subject to the doctrine of re-emergence of land after submergence. The • eastern portion of Eagle Bend Plantation was continually added to by alluvial deposits prior to 1945. The reversal of the direction of the river currents resulting in erosion of that which had been given must be endured. In St. Clair County v. Lovingston, supra, the United States Supreme Court expressed this in this manner:
“ * * * The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature * * * The right is a natural, not a civil one. The maxim ‘Qui sentit onus debet sentire commodum’ lies at its foundation. The owner takes the chances of injury and of benefit arising from the situation of the property. If there is a gradual loss, he must bear it; if a gradual gain, it is his. * * * ” [23 L.Ed. 59, 64]
Appellant has raised a question as the rights of the defendants in a petitory action to be recognized as owners in the judgment. In Dupuy v. Shannon, 136 So. 2d 111 (La.App. 3d Cir. 1961) the Court of Appeal stated:
“A petitory action is one brought by an alleged owner of real estate who is out of possession against another having possession to determine ownership. The settled jurisprudence of this state is that a plaintiff in a petitory action, in order to recover, must rely on the strength of his own title and not on the weakness of that of his adversary. In order to maintain his suit, he carries the burden of proving title in himself. The title of the defendant is not at issue until plaintiff has proved a valid title in himself. * * “The opinion of the district court dismissing plaintiffs’ demands was proper. However, when the judgment was prepared it decreed defendant to be the owner of certain specified real estate. This was in error for the reasons stated above.” [136 So.2d 111, 115]
For the reasons assigned, the judgment of the district court, dated April 7, 1969, is amended by deleting therefrom the following relating to Tracts “A”, “B”, “C” and “D” as hereinafter more definitely described :
“IT IS BY REASON THEREOF ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of C. BICKHAM DICKSON, JR., MICHAEL AUGUSTUS DICKSON, and C. BICKHAM DICKSON, III, defendants in reconvention, and against NORMAN D. STEWART, recognizing the said C. BICK-HAM DICKSON, JR., C. BICKHAM DICKSON, III, and MICHAEL AUGUSTUS DICKSON, to be the owners of the following described property, to-wit:
“TRACT “A” — A 240-acre (more or less tract in Sections 23 and 26, Township 17 North, Range 13 West, as shown in red on the Composite Map of John R. Bowman, Civil Engineer, dated January 7, 1967, attached hereto and made a part hereof and being more particularly described as follows: From the center of Section 24, Township 17 North, Range 13 West, run North 89 degrees 50' West 2640 feet; South 520 feet; North 40 degrees West 40.4 feet; North 47 degrees 12' West 793 feet; North 71 degree 57' West 410 feet; North 83 degrees 25' West 390 feet to a point on the old north bank of Red River as per map recorded in Book 275, page 219, Records of Bossier Parish, Louisiana, *588 and point of beginning of tract herein described; thence South 19 degrees 20' West 3188.4 feet; Thence South 36 degrees West 2057 feet to the north edge of Red River; thence Northerly up the east edge of Red River to intersect the 1957 traverse of old high bank of Red River as per map in Book 275, page 219; thence Easterly along said high bank to the point of beginning, also any batture accrued and attached thereto.
“IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of ANTOINETTE WYCHE BURT and ANTOINETTE BURT SENTELL, defendants, and against the plaintiff, NORMAN D. STEWART, recognizing them to be the owners of the following described property, to-wit:
“TRACT “B” — An 83-acre (more or less) tract in.Sections 23 and 26, Township 17 North, Range 13 West, as shown in green on the Composite Map of John R. Bowman, Civil Engineer, dated January 7, 1967, attached hereto and made a part hereof and being more particularly described as follows: From the center of Section 24, Township 17 North, Range 13 West, run North 89 degrees 50' West 2640 feet; thence South 520 feet; thence North 40 degrees West 40.4 feet to the point of beginning of the tract herein described; thence South 41 degrees 42' West 3294.9 feet; thence South 36 degrees West 1992 feet to the north edge of Red River as per map recorded in Book 275, page 219, Records of Bossier Parish, Louisiana; thence North 67 degrees 17' West 282.6 feet; thence North 36 degrees East 2057 feet; thence North 19 degrees 20' East 3188.4 feet to the old high bank of Red River as per map in Book 275, page 219, thence easterly along said high bank South 83 degrees 25' East 390 feet; South 71 degrees 57' East 410 feet, South 47 degrees 12' East 793 feet to the point of beginning, also any bat-ture accrued and attached thereto.
“IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the defendant, YOUREE A. McCALL, and against the plaintiff, NORMAN D. STEWART, recognizing him to be the owner of the following described property, to-wit:
“TRACT “C” — A 242-acre (more or Less) tract in Sections 23, 24, 25 and 26, Township 17 North Range 13 West as shown in yellow on the Composite Map of John R. Bowman, Civil Engineer, dated January 7, 1967, attached hereto and made a part hereof and being more particularly described as follows: From the center of Section 24, Township 17 North, Range 13 West, run North 89 degrees 50' West 2640 feet; thence South 520 feet; thence North 40 degrees West 40.4 feet to the point of beginning of the tract herein described; thence run southeasterly along the old north and east bank of Red River as per map recorded in Book 275, page 219, of the Records of Bossier Parish, Louisiana, a distance of 3973.3 feet; thence north 83 degrees 12' west 1455.6 feet; thence South 13 degrees 50' West 1124.5 feet to the North edge of Red River as per map in Book 275, page 219; thence Westerly along Red River 2806.8 feet; thence North 36 degrees East 1992 feet; thence North 41 degrees 42' East 3294.9 feet to the old high bank of Red River and point of beginning, also any batture accrued and attached thereto.
“IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the defendant, LESLIE A. COWLEY, and against the plaintiff, NORMAN D. STEWART, recognizing LESLIE A. COWLEY to be the owner of the following described property, to-wit:
“TRACT “D” — A 55-acre (more or less) tract in Sections 25 and 26, Township 17 North, Range 13 West as shown in brown on the Composite Map of John R. Bowman, Civil Engineer, dated January 7, 1967, attached hereto and made a part hereof and being more particularly de *589 scribed as follows: From the center of Section 24, Township 17 North, Range 13 West run North 89 degrees 50' West 2640 feet; thence South 520 feet; thence southeasterly along the old North and East bank of Red River as per map recorded in Book 275, page 219 of the Records of Bossier Parish, Louisiana, a distance of 3932.9 feet to the point of beginning of the tract herein described, thence southeasterly along said old east bank 1677.2 feet to the north edge of Red River, as per map in Book 275, page 219, thence Northwesterly along said edge of Red River 2222.6 feet; thence North 13 degrees 50' east 1124.5 feet; thence South 83 degrees 12' East 1455.6 feet to the point of beginning, also any batture accrued and attached thereto.”
The judgment of the district court is further amended and reformed to show that the reconventional demand of Norman D. Stewart is rejected and dismissed at his cost.
For the reasons assigned above the judgment of the trial court is amended, and as amended, affirmed. Costs of this appeal are assessed to appellant.

. LSA-C.C.P. Art. 3651 The petitory action.

. LSA-C.C.P. Art. 3653.

. In the case of St. Clair County v. Lovingston, 90 U.S. 46, 23 Wall. 46, 23 L.Ed. 59 (1874) the Supreme Court of the United States developed the history of the principles of accretion by citing Roman, French, Spanish, English and American authorities and the court’s conclusion is in accord with the decisions of our Louisiana jurisprudence.

. Matthews v. McGee, 241 F.Supp. 300 (D.C.Ark.1965), affirmed in 358 F.2d 516 (8 Cir. 1966); Banks v. Chicago Mill & Lumber Company, 92 F.Supp. 232 (D.C. *586 Ark.1950); Kimble v. Willey, 98 F.Supp. 730 (D.C.Ark.1951); Mississippi v. Louisiana, 350 U.S. 5, 76 S.Ct. 29, 100 L.Ed. 6 (1955).

. State v. Richardson, 140 La. 330, 72 So. 984 (1916). This case develops the history of the ownership of accretions under LSA-C.C. art. 509. It also defines the terms “river” ; “banks of a river” ; and “shore”.