250 So.2d 708

**C. Bickham DICKSON, Jr., et al.**

**v.**

**J. E. SANDEFUR et al.**

No. 50690.

June 7, 1971.

Rehearing Denied Aug. 12, 1971.

---

· Ferris & Achee, Roland J. Achee, Shreveport, for defendant-plaintiff in re-convention-appellant-relator.

Harry S. Stephens, Twain K. Giddens, Jr., Blanchard, Walker, O'Quin & Roberts, Neilson S. Jacobs, Shreveport, for

plaintiffs-defendants in reconvention-respondents.

BARHAM, Justice.

The district court rendered judgment in favor of plaintiffs on their principal demand and dismissed the reconventional demand of one of the defendants, Norman D. Stewart. The Court of Appeal affirmed,[1] 235 So.2d 579, and we granted writs to review its decision.

C. Bickham Dickson, Jr., and his two sons instituted a possessory action against a number of defendants, claiming the old abandoned bed of Red River, a navigable river, around *Sunflower Peninsula* and the land between that bed and the new bed of the river across *Sunflower Peninsula*. Among the defendants was Norman D. Stewart, owner of *Eagle Bend Plantation*, who answered the possessory action and filed by reconventional demand a petitory action in which he claimed ownership of the old bed of the river around *Eagle Bend Point* of Eagle Bend Plantation as well as all the land lying between the old bed and the present channel of Red River across Eagle Bend Plantation. Stewart's demand claimed ownership of land also claimed by the Dicksons and others who had entered into an act of partition of that

---

1. The Court of Appeal's judgment amended a part of the trial court's judgment which, instead of simply rejecting the attempt to dispossess the defendants in reconven-tion under plaintiff in reconvention's petitory action, attempted to establish title in those defendants.

land in 1958. All parties to the partition were made defendants in the petitory action.

The trial court rendered judgment in favor of the Dicksons in their possessory action, awarding to them the old river bed as it existed prior to 1945 and the land comprising *Sunflower Peninsula* between the old bed and the new bed of Red River. The trial court dismissed the reconventional demand of Stewart. Only Stewart, of all the defendants in the possessory action, appealed from the judgment in favor of the Dicksons in that possessory action. Stewart in his appeal as well as before us states that his position is basically an appeal from the adverse decision on his petitory action in the reconventional demand. He argues that if he is successful in his petitory action, which claims *Eagle Bend Point* and the old river bed there, then the Dicksons are entitled to judgment against him on their possessory action concerning *Sunflower Peninsula*. Stewart simply asserts that the situations at Sunflower and at Eagle Bend are identical, and that the legal determination should not be adverse to him in both instances. We address ourselves to a determination of the rights of the parties under Stewart's petitory action in his reconventional demand in which he claims ownership of the abandoned river bed which surrounded Eagle Bend Point prior to 1945 and the land between it and the new river channel across Eagle Bend Plantation.

The court is most fortunate in this case to have the numerous photographs taken before the flood, during the flood, and after the flood, and it is from these photographs and the experts' testimony concerning them that we are able to reconstruct in large part the occurrences pertinent to this decision.

We have incorporated in this opinion four photographs of exhibits offered by the various parties. We have left the identifying symbols on Photo 3 and have added pertinent additional identifying marks; but on the other photographs we have omitted all identifying marks made during the trial, and the identifying symbols appearing on them as here reproduced are our own. The reader should be careful to note that in Photographs 1, 2, and 4 north is at the bottom of the picture, and therefore east will be to the reader's left and west of course to the right, which is contrary to ordinary map reading. However, Photograph 3 is depicted in the usual manner, with west to the left and east to the right.

[170Z]

PHOTO 1

Photograph taken October, 1944, (shortly before flood), of Sunflower Peninsula (O) and Eagle Bend (B), with demarcation of river bed across both as it appeared in June, 1945 (after flood).

[187Z]

PHOTO 2

Photograph, taken March, 1945, just before crest of flood, of Sunflower Peninsula (O) and Eagle Bend (B). "D" identifies where new bed of river appeared across Sunflower, and "F" where new bed appeared at Eagle Bend as of June, 1945.

[169Z]

PHOTO 3

Cross-section of changing river bed of Red River at Eagle Bend Point. "Y" is new river bed, and "V" is old river bed. Note that the view is upriver (the opposite direction from the other photographs), with west appearing at the left.

[171Z]

## PHOTO 4

Photograph taken October, 1945, showing new bed (Y) at Eagle Bend Plantation and old bed ¼ mile to the east or left of old bed.

One of the greatest floods in the history of Red River occurred in 1945. The floodwater began in early January, crested April 8, and did not completely subside until June. For many years prior to 1945, the plaintiffs, the Dicksons, and their authors in title owned Sunflower Plantation (A Photos 1 & 2), which was located on the east side, or left bank descending, of Red River. Part of Sunflower Plantation was a finger of land, or peninsula (O Photos 1 & 2), consisting principally of alluvion, extending to the west and bounded on the north, west, and south by Red River. For years before the flood of 1945, Red River had been eating away at the basal end or narrow neck at the east of Sunflower Peninsula (D Photos 1 & 2). Photographs taken during March of the 1945 flood (Photo 2) show a constant and progressive encroachment of the floodwaters upon the land at the base or neck of this peninsula (D Photo 2). As the flood increased in activity in height, in March of 1945 the caving of the banks at that site intensified, and during the night of April 1 Red River cut through the peninsula, opening for itself a new bed through the base of the peninsula (D Photos 1 & 2). For some time the river flowed both around the peninsula in its old bed and across the neck of the peninsula in its new bed. Finally the flow of the river totally abandoned its old bed.

Across the river to the south from Sunflower Plantation was a large bend or peninsula known as Eagle Bend Plantation (B Photos 1 & 2), whose record title was in the defendant (plaintiff in reconvention) Norman D. Stewart. Just south of the neck of Sunflower Peninsula where the new bed was formed lay Eagle Bend Point (E Photos 1 & 2), the extreme end of Eagle Bend Plantation. Because of erosion for many years on the eastern bank of the river opposite Eagle Bend Point, there had been extensive accretion to Eagle Bend Point (C Photo 1). Although the alluvion formed was of considerable height in places, it consisted principally of sand and did not support vegetation. The land of Eagle Bend Plantation immediately opposite what would become the lower end of the new bed across Sunflower Peninsula was, however, high bank with an extensive, easily identifiable tree line (H Photos 1 & 2) enclosing land which was of a permanent character before the flood during all the period of time for which we have records. Several hundred feet to the west of this high bank was the first of several levees on Eagle Bend (G Photos 1 & 2). Behind this levee was a house. From Stewart Exhibit No. 78, which is a map prepared by the United States Corps of Engineers, it can be determined that this levee and the house were more than 100 yards removed from the high bank of Ea-

gle Bend, which high bank ran from 157 to 167 feet mean sea level. On Burt Exhibit No. 19 (our Photo 3), which was prepared by a witness for the defendants in reconvention, a potamologist, the new river bed which formed across Eagle Bend Point is depicted as being totally encompassed within the old tree line or permanent land of Eagle Bend. It can be observed that the new river occupied a strip of Eagle Bend approximately 850 feet in width (Y Photo 3) which would have included the levee, the house, and much land behind.

One of the photographs (Stewart Exhibit No. 9 and Dickson Exhibit No. 57; our Photo 2), taken just before the break at Sunflower, shows the narrowing of Sunflower Peninsula caused by the floodwater. In the background, to the northeast, can be seen a portion of the high alluvion at Eagle Bend Point (I Photo 2) with Red River then flowing on both sides of this high alluvion, which was approximately 150 feet mean sea level. To the east of the narrowing of Sunflower Peninsula, one of the Sunflower levees can be seen (J Photos 1 & 2). This levee was located on the main land, not the peninsula, of Sunflower Plantation and was over 1000 feet east of the point where the breakthrough would form the new bed across Sunflower Peninsula. On April 1 the river had reached a flood stage of approximately 30 feet. By noting that the flow of the water around the western point of Sunflower Peninsula in its old bed had suddenly decreased considerably, it was established that on that date, April 1, the water had found an additional place for flow. For some time on Eagle Bend Point immediately opposite the new channel or the breakthrough (F Photos 1 & 2), there was a tremendous turbulence caused by water coming directly onto Eagle Bend's north bank through the new channel meeting at that point the flow of water from the old channel. Red River continued to rise for several days after the breakthrough, not cresting until April 8. The entire area in this vicinity was inundated for some time, and the flood did not totally subside until two months later.

There is expert and lay testimony regarding the effect of Red River on Eagle Bend Point during this time. Some said there was a sudden breakthrough, or cutoff, at Eagle Bend Point, creating a new bed of the river. Others said that there was caving of Eagle Bend Point in chunks until the water flowed where the present channel exists. One expert testified that there were an eroding away from Eagle Bend Point and a progressive accreting to the old east high bank of the river.

From the expert testimony, the photographs, the maps, and the testimony of lay witnesses, it has been established that the new bed of Red River at Eagle Bend Point as early as June, 1945, occupied land of Stewart within what was formerly his high

bank. (Examine our Photos 1, 3, & 4. Note Point Y on Photos 3 & 4.) It covered no alluvion where it began its channel at the north and covered alluvion only at the termination of its new course to the south. We accept the demarcation of the new river as placed on Stewart Exhibit No. 17 at the trial is as a close approximation of its actual course, and have delineated on Photo 1 with dotted lines our version of the new river beds across the Sunflower and Eagle Bend peninsulas as they existed in June, 1945. Immediately after the floodwaters had subsided, the north end of the old river bed had become silted up and closed off so that there was no flow through the old channel. New accretion had attached to old accretion to the Sunflower Plantation main land, effectively blocking the former channel (Z Photo 4). An expert called by the defendants in reconvention established that on the accretion between the old river bed and the new river bed trees began to grow immediately after the subsidence of the water in June, 1945. One boring of a particular tree (P Photo 4), according to that expert, established that the tree started its growth in June or July, 1945, *immediately* after the floodwaters had subsided. A principal criterion for determination of the nature of alluvion is vegetation. The defendants in reconvention have established for the plaintiff in reconvention that the land which accreted to the old river bed—between it

and the new bed—had permanent characteristics immediately after the flood. Moreover, it is important to note that this particular tree was at the southern end of the accreted land which, according to one of the experts, was the last accretion and lowest alluvion. The southern extremity of the old river bed was not closed off or silted over immediately, but it had closed or silted over within a year (W Photo 4). It was more than a quarter mile between the old and new beds measuring from the west bank of the old river bed to the east bank of the new bed (T Photos 3 & 4).

In summary, our factual conclusion is that because of the Sunflower breakthrough, the swift, turbulent floodwaters of Red River made a completely new bed across permanent high land on Eagle Bend Point belonging to Stewart. It did this quickly during one flood. When that flood subsided, the river was visible in its completely new channel, and the new bed could be determined. The old bed was sealed at the north end and no longer carried current. As soon as the floodwaters subsided, permanent growth began on the alluvion which lay between the old and new beds. Shortly afterwards the southern end of the old river bed was closed by silting, and a lake or pond remained in part of this old bed.

Under our law newly formed land which becomes attached successively and *imperceptibly* to other lands by the action of wa-

ters and which is called alluvion belongs to the owner of the land to which the alluvion has attached. La.Civ.Code Art. 509. When running waters retire *imperceptibly* from land on one side, the owner of the land which is left dry may claim this land, which we call dereliction; but if the waters imperceptibly encroach upon the land on the opposite side, the owner who has lost by that imperceptible, gradual encroachment of the waters cannot claim the land he has lost under the water. La.Civ. Code Art. 510. Article 518 is an exception to the general rules establishing the rights of riparian owners. Article 518 reads:

"If a river or stream, whether navigable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost.

"They shall again take their former property if the river or stream returns to its former channel."

The question then posed is: Did the action of Red River on Eagle Bend Point create a new bed of that navigable river (which of course vests in the State) with the result that the owner of the land over which the new bed flowed was entitled to take the abandoned bed as indemnification under this article?

In the Roman law when a river abandoned an old channel and formed a new channel, the former bed vested in the riparian owners along that old bed. Also, in France before the Code Napoleon, according to French law of custom the abandoned bed vested in either the riparian owners or the public domain. Code Napoleon Article 563 is subject to slight variations in translation. Our translation of that article is: "If a 'fleuve' [river emptying into the sea or into an arm of it] or a 'rivière' [river emptying into another river], whether navigable, 'flottable' [subject to carrying rafts and small craft] or not, forms for itself a new bed by abandoning its old bed, the owners of the lands newly occupied take by way of indemnification the old abandoned bed, every one in proportion to the quantity of land he has lost." [2]

2. The French Council of State considered the Projet du Code Civil in the years IX through XII, and the minutes of its sessions were officially published in five volumes. They contain a discussion of the council's approach to what was the Projet Article 556 (originally presented and discussed as Article 557), which was to become Code Napoleon Article 563 and was the source of our Article 518.

3 Procès-Verbaux du Conseil d'État (1803), pp. 96–97. See 1 Pt. 1 Planiol, Treatise on the Civil Law (La.State Law Institute tr. 1959), §§ 83–85. (Planiol says these discussions covered the years X to XII, while the minutes of the Council of State are for the years IX through XII.) In discussion among the council members it was argued that the proposed article was contrary to the Roman law

The French commentators in the years which followed wrote extensively about this article and its effect upon French law. It was almost universally recognized that its meaning, intent, and purpose were as we here announce our law to be.[3] Many writers criticized the law as being a deviation from the general law applicable to lands along running waters and the rights generally accorded to the riparian owners. Although many found that it was equitable

to give the old bed of the abandoned river by reason of indemnification to the man who had lost his land to the new bed, they preferred the consistency of vesting ownership in riparian proprietors. Finally the doctrinal writers prevailed, and by Law of April 8, 1898, the French modified this law.[4]

Our article 518 has as its source the Code Napoleon or one of the projets, and

(which vested old river beds in the owners along those beds), contrary to equity, and contrary to customary law (which would retain in the public domain the beds of abandoned navigable rivers). It was conceded that indemnification or compensation should perhaps be given to the owners of the lands taken for a new bed, but it should not be to the detriment of the prior claims of the riparian owners along the old bed. It was stated that where written law prevailed, there was division in the application of the principle which gave the old bed to riparian owners and the principle which accorded merited privilege to the one whose land was newly taken; but that it was generally agreed that the latter disposition was the more equitable. Maleville, a judge of the Tribunal of Cassation and a member of the commission of four instructed to prepare the Projet, in final argument stated that they were concerned with making a new law, and that it was necessary to follow that equitable principle which gave the old bed to him who had lost his land to the new bed. This argument carried, and the Projet article was adopted by the council just before its adoption by the legislative body as Code Napoleon Article 563. See 2 Maleville, Analyse Raisonnée de la Discussion du Code Civil au Conseil d'État 3e éd. (1822), p. 42; 6 Fenet, Recueil Complet des Travaux Prépara-

toires du Code Civil au Conseil d'État, pp. 146, 163–165; Planiol, supra.

3. 10 Demolombe, Cours de Code Napoléon (1880), §§ 162–175, pp. 130–139; 2 Toullier, Droit Civil Français (1829), Book II, Title II, §§ 157–158, pp. 44–45; 6 Laurent, Principes de Droit Civil Français (1878), §§ 306–308; 1 Daviel, Traité de la Législation et de la Pratique des Cours d'Eau (1845), § 157; Chardon, Traité du Droit d'Alluvion (1840), § 178.

4. Chardon complained that the rules governing the effect of running waters on the soil of the lands through which they flow had been limited to following the doctrine of the Roman jurisconsults, but that with regard to abandoned beds the redactors of the French Code departed from this considered and uniform system which, without being perfect, at least had the merit of being consistent in all of its parts. He also was of the opinion that whether the changes in the beds of watercourses were effectuated progressively by the abandonment of one bank and the accretion to the other or whether the change was effected abruptly when the water abandoned an old bed and opened a new channel, the result in law should be the same. Chardon admitted that the owner where the new channel had been cut was entitled, under the departure in the law of which he

it does not come from the Roman or the Spanish law but is actually contrary to those laws.[5] While the source of our law has changed, the law in Louisiana regarding waters which have abandoned their old beds and formed new channels remains certain and fixed under our Article 518. See 2 Yiannopoulos, Louisiana Civil Law Treatise, § 31, p. 89; see also Fitzsimmons v. Cassity, 172 So. 824 (La.App. 2nd Cir. 1937), and Stephens v. Drake, 134 So.2d 674 (La.App. 2nd Cir. 1961).

In the instant case, counsel for the parties litigant and the Court of Appeal were greatly concerned with whether there had been either a "cutoff" or an "avulsion". We granted writs in this case primarily to determine whether either an avulsion or a cutoff was an ingredient of the process described in Civil Code Article 518.

A "cutoff" was generally defined by those knowledgeable men testifying at the trial as the action of a river when it makes a new bed by cutting through land and

complained, to take the old bed by right of indemnification. Chardon, op. cit. supra fn. 3, §§ 178, 179. Others complained of the departure from the general theory that the riparian owner takes lands abandoned by running water, and the Law of April 8, 1898, amended French Civil Code Article 563 so as to provide that if a river cuts a new bed and abandons its old channel, the riparian owners along the old bed have three months in which to declare their intention to purchase their proportionate interests in the old bed, after which it is sold to others; and that the moneys paid for the abandoned bed are given in compensation and indemnification to the man whose land was submerged by the new flow of the water. More pertinently perhaps, that article now applies only to navigable or "flottable" waters, and the "ou non" (or not) is omitted.

5. It is said in the preface to the reprint of the de la Vergne volume of Moreau Lislet's Digest that the preface to these manuscript annotations states that the references " * * * opposite the French texts are to the actual sources of the texts themselves. These latter are very predominantly to Spanish laws and works, even in those many instances in which it is obvious that the words of the particular

texts were take from the French *Code Civil* of 1804 or one of its projets". Moreau Lislet, A Digest of the Civil Laws Now in Force in the Territory of Orleans (1808), de la Vergne volume 1968. Others have criticized the proposition above stated. See Tucker, Law of Persons, 44 Tul.L.Rev. 264, fn. 8 p. 266. It is most obvious from a study of our Civil Code Article 518 that Moreau Lislet's references in the Digest to writers and laws opposite its predecessor (Art. 17, Book II, Title II, Chapter III, p. 107) "Part. 3 tit.28.loi 31...Dom.v.1. part. 1. liv.2.tit.9.§.1.loi 6....Feb.Cont.v. 2.C.7.§.2.No.81...Fuero real liv.3.tit.4.loi 14." are not the source of that article but to the contrary state the opposing Roman legal principle. Not one of the cited authorities gives any basis or support for the Article 17 appearing opposite these references. They contradict Article 17. It appears that we should accept Moreau Lislet's notes for what he says they are: " * * * des notes qui réfèrent aux Loix civiles et Espagnoles qui y ont rapport". Moreau Lislet states that the references to other laws were not limited to those which contained similar provisions but included also laws which presented differences or even contained exceptions. Cf. Dainow, Moreau Lislet's Notes, 19 La.L.Rev. 43.

leaves a portion of that land between the new bed and the old bed of the river. "Avulsion" was accorded many meanings by the experts, by counsel, and by the appellate court. "Avulsion" has a legal definition: It is "the removal of a considerable quantity of soil from the land of one man, and its deposit upon or annexation to the land of another, suddenly and by the perceptible action of water." Black's Law Dictionary (DeLuxe Ed. 1944). Avulsion in our Civil Code is defined in Article 511,[6] which had as its source Code Napoleon Article 559. Our Code and our law recognize avulsion only under the conditions there required. Avulsion therefore has no application to the case at hand, for it must be conceded by all that the land cut off, cut through, caved in, eroded away, or otherwise displaced at Eagle Bend Point could not then and cannot now be found by anyone in any certain place attached to other land.

■ Counsel in brief before the Court of Appeal and in brief and argument before us relied heavily upon decisions in common law states and upon federal cases determining boundaries between states. We recognize that the courts of other states and the federal courts have applied the terms "avulsions" and "cutoffs" in cases not too dissimilar to the present case. Of course we are not bound by these decisions. We do not find that they are clarifying of our specific Civil Code article or that thay are illuminating for our determination here. Although the legal principle set forth in our Civil Code Article 518 may be contrary to some of the legal principles enunciated in the cited common law cases, the proposition stated in the Code article is very clear and concise, and we are bound by it. The Court of Appeal erred by resorting to the common law principles and by misinterpreting avulsion under Louisiana law. That court erred in stating: "This avulsion principle has been applied by at least three decisions of our Louisiana Courts * * *." It cited Strohecker v. Robinson, 147 La. 652, 85 So. 627 (1920); Fitzsimmons v. Cassity, supra; Stephens v. Drake, supra.

It is difficult to understand the actual facts in Strohecker v. Robinson as reported since no map accompanies the opinion. A review of the maps in State v. Richardson, 140 La. 329, 72 So. 984, and of the entire record and briefs in Strohecker affords a clearer understanding of the Strohecker

6. Article 511 reads: "If the river or stream, whether navigable, or not, carries away by a sudden irruption a considerable tract of land from an adjoining field, which tract of land is suspectible of being identified, by carrying the same on a field lower down, or on the opposite shore, the owner of the tract of land thus carried away, may claim his property, provided he does it within a year, or even after the year has elapsed, if the person, to whose land the soil thus carried away has been united, has not yet taken possession of the same."

decision. It is not applicable to the issue before us.[7]

The two Court of Appeal cases, Fitzsimmons v. Cassity and Stephens v. Drake, correctly applied Civil Code Article 518 to situations where a river had abandoned its old channel and occupied the land of another. It was said in Fitzsimmons:

"The underlying philosophy, as well as the equitable effect of appropriate application of this article, is obvious. The state has no right to acquire private property and not compensate the owner therefor. The beds of [navigable] rivers, it is conceded, belong to the state in its sovereign right. Therefore, when a river changes its course and for this purpose appropriates private property for its new bed, the lawmaker, out of a spirit of justice and fairness, has wisely ordained, in effect, that

the owner of the appropriated land shall be compensated for his loss. by becoming the owner of the abandoned bed. All persons who acquire property adjacent to navigable streams are impressed with knowledge of the existence of this law and, of course, the sovereign, the source of the law, is bound by it. In this connection the case of State v. Richardson, 140 La. 329, 354, 72 So. 984, is illuminating.

\* \* \*

"\* \* \* The depth of the 'Old River' has been reduced materially by silt from the Red river and partakes more of the character of a shallow lake than it does a navigable stream. Being disconnected from any navigable stream, and surrounded by plantation lands, it can serve no useful purpose commercially. *Anyway, article*

---

7. The facts in Strohecker v. Robinson are these: Red River cut a new bed through Stalling's Bend on that river by very gradual erosion over many years until finally in a period of ordinary stage of water the last few feet of the new bed had been cut, referred to by the court as a double width river bed. Water continued to flow around Stalling's Bend in the old river bed until a levee and a dam were constructed across the old river bed making it into a lake.

The land in controversy in Strohecker was the area extending from the levee, which was an artificial work of man, to the west bank of Red River as it existed many years after the original breakthrough and the subsequent building of the levee. The court held, first, that there was no abandonment of the old bed

when the river opened for itself a new channel. It then held that the land in controversy between the levee and the present banks of the river was, at the time of the breakthrough, a part of a double width river, and that gradually the land in controversy was formed by the process of accretion over the years as the new river bed receded to the east. It termed the land in controversy alluvion or dereliction. It was not called upon to decide and did not resolve the issue of whether the owners of the land through which the double width new river cut were entitled to be indemnified from the old river bed, or Horseshoe Lake, which was actually formed artificially by levee and dam and not by the river's cutting itself a new channel and abandoning an old channel.

*518 of the Civil Code makes no exceptions in conferring ownership of abandoned rivers on those whose land has been taken by the new channel."* (Emphasis supplied.)

Fitzsimmons was quoted with approval in Stephens v. Drake, supra. Moreover, in Stephens the appellate court rejected the theory of avulsion and adopted the trial court's reasons, which read:

" 'In the first place, no tract of land was moved or carried away by a "sudden irruption" or otherwise, except, of course, the land taken by the action of the river in establishing a new channel. There is another good reason why RCC Article 511 has no application here. This article says "by carrying the same on a field lower down or on the opposite shore." The land that was "carried away" if it can be said to have been carried away, never attached itself to any land of the defendant * * *.' " See 23 Tul.L.Rev. 257. See also Russ v. Stephens, 90 So.2d 501 (La.App.2nd Cir. 1956), and State v. Richardson, supra.

■ In France until 1898 and in Louisiana through this date, when a river changes and abandons its old course, not imperceptibly or gradually and slowly over a long period of time but in such a manner

as to be readily perceived in a departure not requiring the passage of much time, and finds a completely new bed by occupying other land, the owner or owners of the land or lands which are occupied by the new bed may claim the old bed in the proper proportions as indemnification for their loss of land.[8] It is not required that there be a "cutoff". There need not remain between the old bed and the new bed a piece of ground which also belongs to the one through whose land the new bed has been formed. The new bed can be formed from lands of one owner although lands of many others lie between his land and the old bed. The one who loses land to the new bed still takes the old bed of the river by indemnification no matter how far removed and without need for him to have been a riparian owner along the old bed while it still contained flowing water. Riparian ownership plays no part in the application of Civil Code Article 518.

■ Here Stewart, who established his title to the land now occupied by the new bed, has successfully discharged his burden in the petitory action and therefore takes title to the old bed of Red River as indemnification for the loss of his land to which he has proven title. Stewart has prayed to

---

8. The French writers understood that their Article 563 required the waters to have left their ordinary channel by abandonment of the bed and to have opened a completely new passage. They agreed

that the claim of the old bed by the one whose lands were newly submerged was based upon the principle of indemnification for his loss. See Demolombe, Daviel, and other writers cited at fn. 3, supra.

be declared owner to the high water mark of the east bank of the old river and all alluvion thereto. He is entitled to the *bed* of the old river only to the ordinary low water mark on the east bank and to the alluvion formed to that bed by accretion. He owns all the land where the old bed flowed —whether covered with water or dry—by indemnification under Civil Code Article 518. He owns the land between the old channel and the new channel because it is alluvion.

For the reasons assigned the judgments of the trial court and the Court of Appeal are reversed insofar as they rejected the demands of the petitory action of the plaintiff in reconvention, Norman D. Stewart. The judgments on the original suit, the possessory action, are affirmed as to the defendant Stewart. It is ordered, adjudged, and decreed that defendant, plaintiff in reconvention, Norman D. Stewart, is the owner of the old bed of Red River, as it existed prior to the flood of 1945 in its ordinary low water stage, from the ordinary low water mark on the opposite or east bank of that old bed, and owner of all alluvion which has since formed by accretion to that bed. Since we cannot determine the ordinary low water mark or boundary which we have assigned for the lands of defendant, plaintiff in reconvention, they will have to be determined by agreement or in ancillary proceedings in the court below. The costs of the proceedings in the Court of Appeal and this court and costs of the proceedings in the petitory action—reconventional demand—in the trial court are to be paid by the defendants in reconvention. Witness fees for the experts of the plaintiff in reconvention are fixed at $50.00 per day and also taxed as costs to the defendants in reconvention.

DIXON, J., recused, having performed judicial act in this case in another court.

On Application for Rehearing

PER CURIAM.

The writ granted on the application of Norman D. Stewart also presented for our review the trial court's judgment as amended by the Court of Appeal in favor of the Dicksons in their possessory action in which they claimed the old river bed around Sunflower Peninsula. The judgments below gave the plaintiffs, the Dicksons, possession of that land of the old river bed around Sunflower Peninsula to the high water mark on the opposite bank instead of to the ordinary low water mark. This is error, as can be noted from our opinion. In order to fix boundaries which are uniform for Norman D. Stewart's land, Eagle Bend Plantation, and in accordance

with law, we amend the judgment in the possessory action.

The judgments of the trial court and the Court of Appeal are reversed insofar .as they recognize C. Bickham Dickson, Jr., Michael Augustus Dickson, and C. Bickham Dickson, III, to be in possession to the old high bank of the old bed of Red River around Sunflower Peninsula. It is now ordered, adjudged, and decreed that there be judgment in favor of the plaintiffs, C. Bickham Dickson, Jr., Michael Augustus Dickson, and C. Bickham Dickson, III, against Norman D. Stewart, decreeing that the plaintiffs be quieted in their possession of the old bed of Red River around Sunflower Peninsula as it existed prior to the flood of 1945, to the ordinary low water mark of the bank of Eagle Bend Plantation. Since we cannot determine the ordinary low water mark or boundary, it is to be determined by agreement or in ancillary proceedings in the trial court.

McCALEB, C. J., dissents from the refusal of the Dicksons' application for rehearing, as he entertains grave doubts .anent the correctness of our holding that Article 518 of the Civil Code is applicable to the facts of this case.

Furthermore, he questions the authority of this Court to change its original decree to the detriment of the Dicksons by a per curiam opinion, thus divesting a substantial right without a contradictory hearing.