535 So.2d 1091 (1988)
STATE of Louisiana, Plaintiff-Appellant,
v.
Massie Lee Barbo BOURDON and John Henry Bourdon, Defendants-Appellees.
No. 20071-CA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1988.
Writ Denied January 13, 1989.
William J. Guste, Jr., Atty. Gen., Gary L. Keyser, David C. Kimmel, Asst. Attys. Gen., Baton Rouge, for plaintiff-appellant.
William R. Jones, Coushatta, for defendants-appellees.
Before MARVIN, FRED W. JONES, Jr. and LINDSAY, JJ.
MARVIN, Judge.
In this petitory action to determine ownership of the bed of an oxbow lake created in this century by Red River near the Grand Bayou community in Red River Parish, the State appeals a judgment rejecting its demands and decreeing that the 123-acre bed of the lake is privately owned by defendants by virtue of 30 years acquisitive prescription.
We affirm on the authority of C.C. Art. 504; Dickson v. Sandefur, 259 La. 473, 250 So.2d 708 (1971); Stephens v. Drake, 134 *1092 So.2d 674 (La.App. 2d Cir.1961), cert. denied, and Verzwyvelt v. Armstrong-Ratterree, Inc., 463 So.2d 979 (La.App. 3d Cir. 1985). This appeal is a belated sequel to Strohecker v. Robinson, 147 La. 652, 85 So. 627 (1920), the plaintiffs there being the ancestors in title of the private landowner-defendants here.

THE RED RIVER AT STALLINGS BEND
From Strohecker, supra, and plats and exhibits in this record, we glean some facts about the Red River and its meanderings during the past 150 years in sections 23-26, T13N, R11W. Our composite plat, roughly to scale, will illustrate some of the history of the dispute which involves the oxbow lake bed in the peninsula once existing that was known as Stallings Bend Plantation in the latter part of the 19th century.
The river created the peninsula sometimes before the 1830's and cut it off in 1902 before meandering easterly to its present location. Except for the oxbow lake, the former peninsula is not identifiable in an aerial photograph made in the 1980's. We reproduce the composite plat to illustrate the factual circumstances:
*1093 
*1094 The earliest government surveys were completed in the 1830's. We shall assume, as the State contends, that the course of Red River around the peninsula was not grossly changed between 1812 when Louisiana became a State and the 1830's when the government surveys were completed.
Stallings owned the peninsula in sections 23 and 26 and established the peninsula lands as a plantation in 1857. Kennedy owned the lands in sections 23 and 24 north of the westerly flowing river. Robinson owned the lands in section 25 and 26 south of the easterly flowing river.
In 1880, the Stallings heirs partitioned the Stallings lands, which included lands other than the peninsula. The defendant landowners' title stems from the partition and refers to lands only in section 23. The government surveys show, however, that some of the peninsula was in sections 24-26.
The peninsula at its narrowest point, north to south, in the 1830's was some 1,300 feet. By the end of that century the river on the north and on the south had eroded the narrowest point of the peninsula to about 500 feet. In 1902, this distance shrunk to about 20 feet before completely caving in and washing away about a quarter mile of river frontage. This 1,300-foot break through the peninsula allowed the westbound river on the north to unite with the eastbound river on the south and temporarily made an island of the high ground in the west end of the former peninsula.
As the westerly flowing river on the north ate its way through the north side of the peninsula, alluvion was added to the Kennedy property in section 23 north of the peninsula. Similarly, as the easterly flowing river on the south ate its way through the south side of the peninsula, alluvion was added to the Robinson property in section 26 south of the peninsula.
The new river immediately after the break was 1,300 feet wide and gradually moved eastward. Strohecker refers to a levee that was built a "considerable distance" (we estimate about 400 feet) east of the east point of the island that was formed when the river was flowing around the island and through the 1,300-foot break. The river, then 1,300-feet wide, apparently then began to narrow and meander eastward, attempting to straighten itself. The levee was apparently built as the river narrowed and left derelicted dry sand bars.
Strohecker refers to the break or washout as having occurred at the east end of the Stallings Bend plantation, to the horseshoe bend as being "converted" into a cut-off lake, and to the plantation as being bounded north, west, and south by the cut-off lake and on the east by the levee or west bank of the new bed of the river. 85 So. at 628.
The alluvion in controversy in Strohecker apparently joined and obliterated most of the former bed of the river, and was described as "extending eastward from the levee to the west bank of the river ... and southward from the southern boundary of the original Kennedy plantation to the northern boundary of the original Robinson plantation."
The levee across the former peninsula yet exists, being shown on the aerial photo and plats in the record, and is about 2,000 feet from the SW corner of section 23. The gradual eastward recession of the river continued after 1902. The aerial photo made in the 1980's shows the river, once only about 2,000 feet east of the SW corner of section 23, to have meandered more than 8,000 feet east of that corner.
The Strohecker v. Robinson controversy was resolved by the Supreme Court of Louisiana 18 years after the river cut off the peninsula in 1902. Strohecker and Wilson, successors to Stallings and ancestors to defendant landowners here, unsuccessfully claimed 29 acres of alluvion vs. Robinson and 62 acres of alluvion vs. Kennedy.
Strohecker noted that a plat showed that "when the river caved in and the levee was constructed ... the Stallings Bend plantation came to a point at its east end a considerable distance west from the levee, and the old river or cut-off lake flowed on both sides of the point and beyond it eastward to the levee." 85 So. at 629. From *1095 1914 and 1945 plats we deduce the east point of the island was 400 feet from the levee. We do not know the date of that plat and, of course, do not deduce that the levee was built while the water flowed through the cut-off lake.
A 1945 plat tracks the detail of a 1914 plat and lends some understanding to the Strohecker explanation of what occurred during and after the 1902 break and uniting of the river. The sand bars or batture shown surrounding the higher "land" of the island that temporarily existed following the 1902 break, apparently then formed and connected west of the levee to stop the flow of the river and to create the oxbow lake. The river meandered eastward, leaving derelicted lands east of the levee. In any event before 1920, the river had abandoned its former bed and created a new bed which meandered eastward. We reproduce the 1945 plat which effectively tracks the 1914 plat that shows the relationship of the oxbow lake to the levee and to section lines:

Accretions that formed on the Robinson and Kennedy lands before the break were also at issue in Strohecker. That court noted that plaintiffs "virtually conceded" the ownership of those accretions to Robinson and Kennedy, whose lands increased in depth by the accretions at least 400 feet. Strohecker reserved to its plaintiffs "whatever right they may have for accretion or alluvion that has formed since the river bank caved in, in December 1902." The bed of the oxbow lake that was formed was not at issue in Strohecker.
*1096 The court stated the controversy in Strohecker:
The major part of the area in controversy is space that was occupied by the river when it had acquired a double width by the caving in of the narrow partition between the two beds of the river [in 1902]. That space, however, was not acquired by the plaintiffs ... because the river did not [at the point of the cave-in] open itself a new bed by leaving its former channel, ... but the two beds of the river came together, occupying as much space as they had occupied before. The double-width river bed east of the levee was thereafter vacated by the water, not by the sudden process described in article 518 [now art. 504] of the Code, but by the gradual process described in articles 509 and 510 [now art. 499].

THE STATE'S CONTENTIONS
The State contends that the oxbow lake, from 1812 until 1902, was the bed of Red River, "navigable in law," and a "public thing" not susceptible of private ownership under C.C. Art. 450. We have assumed this contention to be true, notwithstanding that the State has not shown where the bed of Red River was in 1812.
The State contends that a water body, navigable in 1812, is deemed navigable thereafter. In the broad and general sense, we assume this contention is correct.
The State acknowledges C.C. Art. 504 When a navigable river or stream abandons its bed and opens a new one, the owners of the land on which the new bed is located shall take by way of indemnification the abandoned bed, each in proportion to the quantity of land that he lost...
but argues that the phrase abandoned bed should not be deemed to include the bed of a newly-formed, navigable oxbow lake because the redactors did not use phrases such as "abandoned river" or "abandoned lake," and did not intend to deprive the public of the right to use a natural navigable waterbody which was previously enjoyed.
The State says that because the owner who loses land when a meandering river makes a new bed may not be a "riparian owner" of lands surrounding the newly formed oxbow lake, our affirmance of the judgment would deprive the owners of land around a newly formed oxbow lake the "alluvion and dereliction" rights that are provided riparian owners by the Code.
The State suggests that the "correct" way we should interpret the phrase "abandoned bed" in Art. 504, in the light of Art. 499 (the article granting alluvial and dereliction rights), especially where the landowner who "loses" to the new bed of the meandering river is a "riparian owner" around the newly formed oxbow lake, is to reason that the accretion and dereliction rights afforded the losing landowner "compensates" and indemnifies him for the loss of land to the river.
The State, however, does not cite us any authority to support its argument and does not discuss or attempt to distinguish the authorities to the contrary, the more pertinent of which we have cited in paragraph two of this opinion. The landowners, of course, rely on authorities, including the ones we have cited.
The phrase "abandoned bed" in Art. 504 is not ambiguous and does not require a strained interpretation.

THE LAW
The State fails to recognize that there is no right to alluvion or dereliction on the shore of lakes (CC Art. 500) and that there are no riparian rights to the bed of non-navigable lakes (CC Art. 506 and Revision Comments). Alluvial and dereliction rights (CC Art. 499) belong only to the riparian owners of the banks of a river or a stream, a flowing body of water distinct in the law from a lake.
Art. 450 speaks of a natural navigable water body as being a public thing. The bed of an oxbow lake, navigable in 1812, remains a public thing after 1812. The bed of the river that formed a navigable oxbow lake before 1812 is a public thing. The oxbow lake in question here, even according to the State, did not exist in 1812, but *1097 was created, as we have described, in 1902. Before 1902, the oxbow lake was merely Stallings Bend in Red River, the bed of the river being a public thing under CC Art. 450, even though meandering.
Once the break in the peninsula occurred Stallings Bend of the river only temporarily remained a public thing. When the river thereafter abandoned the Stallings Bend bed and moved eastward, creating the oxbow lake and opening a new bed, the private owners of the land on which the new bed was located were privileged to "take" or claim the abandoned bed of the river, now the oxbow lake that was created from the Stallings Bend.
The foregoing principle is clearly expressed in CC Art. 504 and is not contingent upon the abandoned bed being wet, dry, navigable or non-navigable in fact or in law, but simply arises out of a navigable river abandoning its bed for a new one after 1812.
When a navigable river or stream abandons its bed and opens a new one, the owners of the land on which the new bed is located shall take by way of indemnification the abandoned bed, each in proportion to the quantity of land that he lost. If the river returns to the old bed, each shall take his former land.

CC Art. 504.
This article is not ambiguous and makes no exceptions in conferring private ownership of the abandoned river bed on those whose land has been taken by the new channel. Stephens, supra, 134 So.2d at 677.
Whether the river abandons its course abruptly, or gradually and slowly, the private landowner who loses to the new bed, takes the abandoned bed as indemnification. It is not required that there be a cut-off. The losing landowner "takes" the old bed no matter how far removed it is from his property, and without need for him to have been a riparian owner along the old river bed. Riparian ownership plays no part in the application of this article. Dickson, supra, 250 So.2d. at 720.
The abandoned bed of a navigable river that changes its bed or course may remain, in fact, a natural navigable water body, as the State contends. If, however, the change in the river bed occurs after 1812, the abandoned bed, even though an oxbow lake that is navigable in fact, as a matter of policy or law for more than 175 years under the specific provisions of Art. 504, loses its identity as a public thing and becomes privately owned. The specific provisions of Art. 504 control the general declaration of Art. 450 in such circumstances.

DECREE
Under the specific provisions of CC Art. 504, the bed of the oxbow lake known as Wilson Lake is susceptible of private ownership. The State did not otherwise contest the judgment or the legal sufficiency or duration of defendants' acts of possession for more than 30 years. Under these circumstances, the judgment of the trial court is therefore, at appellant's cost,
AFFIRMED.